805 F.2d 1323
 55 USLW 2331, 6 Fed.R.Serv.3d 568, 22
Fed. R. Evid. Serv. 125
 James R. SHELTON and Elizabeth Ann Shelton,
Co-administrators of the Estate of Coletta K.
Shelton, Appellees,
v.
AMERICAN MOTORS CORPORATION, American Motors Sales
Corporation, and Jeep Corporation, Appellants.
 No. 85-2442.
 United States Court of Appeals,
Eighth Circuit.
 Submitted June 11, 1986.
Decided Dec. 2, 1986.
Rehearing and Rehearing En Banc Denied Jan. 30, 1987.
 
 Gary E. Crawford, New York City, for appellants.
 E.C. Gilbreath, Fort Smith, Ark., for appellees.
 Before HEANEY, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and BATTEY,* District Judge.
 FLOYD R. GIBSON, Senior Circuit Judge.
 
 
 1
 The defendants, American Motors Corporation, American Motors Sales Corporation, and Jeep Corporation, appeal from the district court's order granting the plaintiffs' motion for default judgment. The district court entered default judgment against the defendants as a sanction for their in-house counsel's repeated refusal to answer deposition questions concerning the existence of certain documents. The district court held that the information sought by the plaintiffs is not protected by the work-product doctrine or the attorney-client privilege, and that counsel's repeated refusals to respond warranted default judgment on the issue of liability, 106 FRD 490. For the reasons discussed below, we reverse.
 
 I. BACKGROUND
 
 2
 Coletta Shelton died as a result of an accident that occurred when the Jeep CJ-5 she was driving overturned on a roadway in Sebastian County, Arkansas. The Jeep CJ-5 was designed, manufactured, and sold by the defendants (hereinafter referred to collectively as AMC). Coletta's parents filed this product liability action against AMC, alleging various theories of recovery, including strict liability, negligence, and failure to warn. Since its inception, the case has been plagued by discovery disputes.
 
 
 3
 Shortly after initiating the action, the plaintiffs filed notices to take depositions, specifically naming twenty-one deponents and describing ten "Rule 30(b)(6) categories."[1] AMC moved to quash the depositions, and sought a protective order in which it offered to produce six individuals who possessed the information sought by the plaintiffs. The court ordered AMC to produce for deposition those six individuals and, if necessary, any additional persons with knowledge of the ten Rule 30(b)(6) categories. Following the depositions of the persons produced by AMC, the plaintiffs moved for sanctions, including default judgment, alleging that AMC falsely represented to the court that the six individuals possessed the same information as the twenty-one individuals initially named by the plaintiffs, and that AMC specifically instructed the individuals with knowledge of the ten described categories not to answer certain questions. The district court referred all discovery matters to the magistrate, who denied the plaintiffs' motion for sanctions.
 
 
 4
 The plaintiffs then filed notice to take the depositions of several more individuals, including Rita Burns. Burns is employed by AMC as an attorney in its Litigation Department, and she was assigned specifically to the case at bar as AMC's supervising "in-house counsel." AMC sought a protective order and moved to quash the depositions. The magistrate granted the protective order with respect to certain Rule 30(b)(6) categories, but denied AMC's motion to quash. The plaintiffs deposed Burns, but she refused to answer several questions on the basis that the information sought by the plaintiffs was protected by the work-product doctrine or by the attorney-client privilege. The questions which Burns refused to answer primarily concern the existence or nonexistence of various documents regarding the Jeep CJ. The plaintiffs again moved for sanctions, including default judgment, on the basis of Burns' refusal to answer those questions. The magistrate denied the motion, but ordered AMC to make Burns available to give her deposition before the magistrate so that he could rule on any objections made by AMC concerning the work-product doctrine or the attorney-client privilege.
 
 
 5
 Burns appeared before the magistrate and again refused to respond to questions concerning her knowledge of the existence or nonexistence of certain documents.[2] Burns' typical response to these questions was, "Any information I have concerning documents which might possibly be responsive to your question, I've acquired solely through my capacity as an attorney for American Motors in my efforts to find information which would assist me in defending the company in litigation, and therefore, I decline to respond to the question." Despite the magistrate's order to respond, AMC's trial counsel instructed Burns not to answer, and attempted to clarify that AMC and Burns were relying on the attorney-client privilege or the work-product doctrine, or both, depending on the specific question. The magistrate overruled most of AMC's objections, ruling that the responses sought by the plaintiffs were not protected under either the privilege or the doctrine.
 
 
 6
 The magistrate recommended that the district court order AMC to show cause why Burns should not be held in contempt, and why sanctions, including default judgment, should not be entered against AMC. The district court issued the show cause order, and AMC responded that it would "stand on its position" as stated in the depositions. The district court granted the plaintiffs' motion for default judgment on the issue of liability.[3]
 
 
 7
 The district court held that neither the attorney-client privilege nor the work-product doctrine protect the information sought by the plaintiffs: "neither objection can properly bar inquiry into Ms. Burns' mere knowledge of the existence of the documents." The court concluded that "the mere fact that the documents or knowledge of the documents came to the attorney while acting for the client is not sufficient to invoke the [attorney-client] privilege," relying on Arkansas National Bank v. Cleburne County Bank, 525 S.W.2d 82, 84-85 (Ark.1975) ("An attorney may be required to produce papers belonging to his client where the knowledge of their existence is accessible to others or to the public, or if, * * * the client may be compelled to produce them."). The court also concluded that the work-product doctrine does not protect discovery, by interrogatories or deposition, of the facts that an adverse party's lawyer has learned from documents assembled by the adverse party, or the existence or nonexistence of those documents, relying on Wright & Miller, Federal Practice and Procedure Sec. 2023 at 194 (1970). The district court reasoned that Burns' repeated refusal to comply with orders to respond made by both the magistrate and the court, and AMC's lack of legal authority for its position warranted default judgment as a sanction, 106 FRD 490. See Fed.R.Civ.P. 37(b)(2)(C). The district court certified its order pursuant to 28 U.S.C. Sec. 1292(b), and AMC filed this appeal.[4]
 
 
 8
 The issue on appeal is whether a deponent's mere acknowledgment of the existence of corporate documents is protected by the work-product doctrine or the attorney-client privilege. We hold that where, as here, the deponent is opposing counsel and has engaged in a selective process of compiling documents from among voluminous files in preparation for litigation, the mere acknowledgment of the existence of those documents would reveal counsel's mental impressions, which are protected as work product.
 
 II. DISCUSSION
 
 9
 The plaintiffs argue that AMC has taken the position that it was improper to depose Burns because she represents a party in this litigation. The plaintiffs contend, therefore, that the issues are whether the deposition of opposing counsel may be taken and, if so, whether counsel must respond to questions concerning the existence or nonexistence of certain documents possessed by counsel's client. Indeed, in addition to arguing that the information sought by the plaintiffs is protected by the work-product doctrine and the attorney-client privilege, AMC's position has been that in these circumstances deposing its in-house counsel is an inappropriate method of discovering the existence of documents in AMC's possession.
 
 
 10
 In recent years, the boundaries of discovery have steadily expanded, and it appears that the practice of taking the deposition of opposing counsel has become an increasingly popular vehicle of discovery.[5] To be sure, the Federal Rules of Civil Procedure do not specifically prohibit the taking of opposing counsel's deposition. See Fed.R.Civ.P. 30(a) (a party may take the deposition of "any person "). We view the increasing practice of taking opposing counsel's deposition as a negative development in the area of litigation, and one that should be employed only in limited circumstances.
 
 
 11
 Undoubtedly, counsel's task in preparing for trial would be much easier if he could dispense with interrogatories, document requests, and depositions of lay persons, and simply depose opposing counsel in an attempt to identify the information that opposing counsel has decided is relevant and important to his legal theories and strategy. The practice of forcing trial counsel to testify as a witness, however, has long been discouraged, see Hickman v. Taylor, 329 U.S. 495, 513, 67 S.Ct. 385, 394, 91 L.Ed. 451 (1947) (it causes "the standards of the profession [to] suffer"), and recognized as disrupting the adversarial nature of our judicial system, see id. at 516, 67 S.Ct. at 396 (Jackson, J., concurring) ("Discovery was hardly intended to enable a learned profession to perform its functions * * * on wits borrowed from the adversary."). Taking the deposition of opposing counsel not only disrupts the adversarial system and lowers the standards of the profession, but it also adds to the already burdensome time and costs of litigation. It is not hard to imagine additional pretrial delays to resolve work-product and attorney-client objections, as well as delays to resolve collateral issues raised by the attorney's testimony. Finally, the practice of deposing opposing counsel detracts from the quality of client representation. Counsel should be free to devote his or her time and efforts to preparing the client's case without fear of being interrogated by his or her opponent. Moreover, the "chilling effect" that such practice will have on the truthful communications from the client to the attorney is obvious.
 
 
 12
 We do not hold that opposing trial counsel is absolutely immune from being deposed. We recognize that circumstances may arise in which the court should order the taking of opposing counsel's deposition. But those circumstances should be limited to where the party seeking to take the deposition has shown that (1) no other means exist to obtain the information than to depose opposing counsel, see, e.g., Fireman's Fund Insurance Co. v. Superior Court, 140 Cal.Rptr. 677, 679, 72 Cal.App.3d 786 (1977); (2) the information sought is relevant and nonprivileged; and (3) the information is crucial to the preparation of the case.
 
 
 13
 This case does not present those limited circumstances. The record indicates that the information sought can be, and in some instances has been, obtained by means other than deposing inhouse counsel Burns. The plaintiffs sought to determine whether AMC possessed documents concerning primarily "rollover" tests and "rollover" accidents involving AMC's Jeep CJ vehicles. Trial counsel for AMC indicated that it would be willing to answer these questions through the depositions of AMC officials who were not attorneys in its Litigation Department. Burns' Second Deposition Transcript at 44. AMC's trial counsel also indicated more than once that the documents about which counsel was inquiring had been previously produced. E.g., id. at 20 and 68. Indeed, plaintiffs' counsel indicated that he was asking Burns these questions to determine whether AMC had in fact truthfully and fully complied with his document requests and interrogatories. Burns testified and AMC's trial counsel stated, however, that to their knowledge AMC's discovery responses were complete.
 
 
 14
 In addition, the record demonstrates that the information sought is privileged. As discussed below, we hold that in-house counsel's knowledge of the existence of the documents in these circumstances is protected by the work-product doctrine.
 
 
 15
 This case does not involve AMC's refusal to produce the documents inquired about by plaintiffs' counsel. And AMC does not contend that the documents themselves, prepared by other departments for the purpose of analyzing AMC vehicles, are protected as work product simply because those documents now may be in the possession of AMC's Litigation Department. AMC contends that Burns' acknowledgment of the existence of documents referred to by plaintiffs' counsel would reflect her judgment as an attorney in identifying, examining, and selecting from AMC's voluminous files those documents on which she will rely in preparing her client's defense in this case. In these circumstances Burns' recollection of the documents concerning a certain subject will be limited to those documents she has selected as significant and important with respect to her legal theories. Therefore, AMC argues, requiring Burns to testify that she is aware that documents exist concerning a certain issue is tantamount to requiring her to reveal her legal theories and opinions concerning that issue. We agree.
 
 
 16
 The Supreme Court in Hickman v. Taylor, supra, recognized that a lawyer in preparing the client's case, assembles information, sifts through what the lawyer considers to be relevant facts, prepares "legal theories and plan[s] strategy, without undue and needless interference." This work, which has become known as counsel's "work product," is reflected "in interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs, and [in] countless other tangible and intangible ways." Hickman, 329 U.S. at 511, 67 S.Ct. at 393. The Supreme Court acknowledged the well-recognized policy against invading the privacy of an attorney's course of preparation. The Court held that a party may invade that privacy in search of relevant and nonprivileged facts only upon a showing of adequate justification. Id. at 512, 67 S.Ct. at 394. The work-product doctrine not only protects from discovery materials obtained or prepared in anticipation of litigation, but also the attorney's mental impressions, including thought processes, opinions, conclusions, and legal theories. See id. at 511, 67 S.Ct. at 393 (an attorney's thoughts are "inviolate"); In re Murphy, 560 F.2d 326, 336 (8th Cir.1977) (attorney's opinion work product enjoys nearly absolute immunity and can be discovered in very rare and extraordinary circumstances); Fed.R.Civ.P. 26(b)(3) (unlike ordinary work product, opinion work product cannot be discovered upon a showing of substantial need or undue hardship).
 
 
 17
 Burns testified that she is aware of documents in AMC's possession only as a result of her investigation and examination of those documents in preparing for litigation. She testified that she identified, selected, and compiled documents that are significant to her client's defenses in this case. Burns explained this identification and selection process as follows:
 
 
 18
 You see, whether or not I am aware of the documents, in part reflects the efforts that I have made and decisions I have made concerning what I think is important in the litigation. Who I've gone to to find out what documents they have, what documents I have looked at.
 
 
 19
 Burns' Second Deposition at 19. She later added:
 
 
 20
 I represent American Motors Corporation in litigation and in order to develop a defense for that case I make determinations as to what documents I need to find out about, what I need to discuss with people, what I know and what I remember is a reflection of an identification that I have made that this issue is important, this document is important, this process is important, because I have made the decision to find out about it, uh, to know about it and to maintain information concerning it. To that extent it's a reflection of judgments and evaluations that I have made as a lawyer in the process of defending my client.
 
 
 21
 Id. at 38.
 
 
 22
 In cases that involve reams of documents and extensive document discovery, the selection and compilation of documents is often more crucial than legal research. James Julian, Inc. v. Raytheon Co., 93 F.R.D. 138, 144 (D.Del.1982). We believe Burns' selective review of AMC's numerous documents was based upon her professional judgment of the issues and defenses involved in this case. This mental selective process reflects Burns' legal theories and thought processes, which are protected as work product. See Sporck v. Peil, 759 F.2d 312, 316 (3d Cir.1985) (selection and compilation of documents by counsel falls within the highly protective category of opinion work product), cert. denied, --- U.S. ----, 106 S.Ct. 232, 88 L.Ed.2d 230 (1985). Moreover, in these circumstances we believe that any recollection Burns may have of the existence of documents in AMC's possession likely would be limited to those documents she has selected as important to her legal theories concerning this case. Thus, contrary to the plaintiffs' argument, the questions asked require more than merely acknowledging the existence of certain documents. If Burns were compelled to acknowledge whether specifically described documents exist, she necessarily would reveal her mental selective process. Burns' acknowledgment would indicate to her opponent that she had reviewed the document and that, since it was important enough to remember, she may be relying on it in preparing her client's case. Consequently, we hold that where, as here, the deponent is opposing counsel and opposing counsel has engaged in a process of selecting and compiling documents in preparation for litigation, the mere acknowledgment of the existence of those documents would reveal counsel's mental impressions, which are protected as work product.
 
 
 23
 The plaintiffs rely on cases that stand for the proposition that the work-product doctrine does not apply where the information sought is the existence or nonexistence of work product. See, e.g., Smith v. Insurance Co. of North America, 30 F.R.D. 534, 538 (M.D.Tenn.1962); McCall v. Overseas Tankship Corp., 16 F.R.D. 467, 469 (S.D.N.Y.1954). But as we have said, the case at bar involves answers to questions that would reveal more than the mere existence of documents. The plaintiffs also rely on Arkansas National Bank v. Cleburne County Bank, supra. That case is inapplicable here because it involved the attorney-client privilege, not the work-product doctrine.
 
 
 24
 Therefore, we conclude that the district court erred in holding that the information sought by the plaintiffs was not protected as work product. Consequently, we need not decide whether the information sought is protected by the attorney-client privilege.[6]
 
 
 25
 Because the information sought by the plaintiffs was protected as work product, we hold that the imposition of default judgment was erroneous. We also note that such a severe sanction in these circumstances is unwarranted. The sanction imposed must be "just" and "specifically related to the particular 'claim' which was at issue in the order to provide discovery." Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 707, 102 S.Ct. 2099, 2106, 72 L.Ed.2d 492 (1982). Moreover, the record must show a willful and bad faith failure to comply, and that the other party has been prejudiced by that failure. See Edgar v. Slaughter, 548 F.2d 770, 773 (8th Cir.1977). AMC's repeated refusal to obey discovery orders was undoubtedly willful, and we do not condone such conduct. Parties proceed at great risk when they fail to comply with discovery orders. Nevertheless, we disagree with the district court that AMC's refusals were in bad faith. AMC was given no alternative but to refuse; if Burns responded, she would have exposed her work product.[7]
 
 
 26
 In-house counsel in this case had nothing to do with this lawsuit except to represent her client. She did not design the jeep or have any duties in relation to the design of the jeep; nor, of course, was she a witness to the accident. The harassing practice of deposing opposing counsel (unless that counsel's testimony is crucial and unique) appears to be an adversary trial tactic that does nothing for the administration of justice but rather prolongs and increases the costs of litigation, demeans the profession, and constitutes an abuse of the discovery process.
 
 III. CONCLUSION
 
 27
 The information sought was protected by the work-product doctrine as "mental impressions" of opposing counsel. Consequently, default judgment was unwarranted here, and we reverse the district court's decision.
 
 
 28
 BATTEY, District Judge, dissenting.
 
 
 29
 This case involves more than the issues of "work product" and "attorney-client privilege." It involves the calculated decision of AMC, with all of its resources and faced with products liability litigation, to embark on a course of action which effectively thwarted the discovery process. This course of action was taken even at the risk of incurring the severe sanctions imposed in this case. Approximately thirty-six months have passed since the first motion for discovery on November 21, 1983, and the question of whether or not certain documents exist is still unresolved. Surely AMC is better able to sustain lengthy litigation than the individual plaintiffs. To reverse this case would be to condone such conduct.
 
 
 30
 In the context of this case neither the attorney-client privilege nor the work-product doctrine protects the information sought by the plaintiffs. Furthermore, this opinion departs from the requirements of Diversified Industries, Inc. v. Meredith, 572 F.2d 596 (8th Cir.1977).
 
 
 31
 I respectfully dissent.
 
 
 32
 This case is replete with evidence of AMC's repeated acts and attempts to avoid the discovery of documents in its possession. The process of discovery commenced on November 21, 1983. Delaying tactics on the part of AMC continued for 20 months until the directed verdict of liability was issued on June 21, 1985. That the acts on the part of AMC were willful is without question.
 
 
 33
 The constant, growing tendency of litigants to frustrate the trial discovery process such as was done by AMC is dangerous and "chilling" to a process which is geared toward a search for truth. Hickman v. Taylor, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed.2d 451 (1947) and its progeny light the way toward open discovery. Fed.R.Civ.P. 26(b)(3) had earlier embodied the proposition that discovery should be liberally permitted subject to the control of the court to prevent abuse.
 
 
 34
 The often raised defense used to blunt persistent and piercing discovery is the defense of "work product" and "attorney privilege." Such concepts, narrow in scope though they may be, are often attempted to be used as swords rather than shields. Upon reading this record one cannot help but conclude that AMC raised such defenses in a hope of "stonewalling" the process. In doing so it knowingly ran the risk of the sanction imposed. When the district court issued its sanction show cause order, AMC cavalierly responded that it would "stand on its position." To respond in such manner foreclosed the trial judge's options. It afforded him no opportunity to arrive at an accommodation or at least a sanction less than the ultimate sanction granted. That AMC may not have expected the ultimate sanction of directed liability is not necessarily to its credit. It "faced-off" with the federal court and it should now be held to the consequence of its decision.
 
 
 35
 The imposition of sanctions under Fed.R.Civ.P. 11 is an important tool used to enforce the authority of the trial court. Perhaps even more important than the actual use of sanctions is the threat of such use. The ability of the court in a given case, properly supported by the appellate court, contributes greatly to the prompt resolution of the many cases facing the federal trial courts. Within the limited confines of this case the actual use of the sanction of directed liability was appropriate.
 
 I. WORK PRODUCT
 
 36
 The plaintiffs commenced the discovery process by filing notice to take depositions and describing ten "Rule 30(b)(6) categories."[1] AMC countered with motions to quash and for a protective order. Six individuals were designated by AMC and upon the taking of their depositions AMC (1) provided the names of individuals who either knew little if anything about the facts or possessed little or no knowledge of the existence of documents sought, and (2) instructed the witnesses not to answer certain questions.
 
 
 37
 In an attempt to resolve the conflict, the district court referred the matter to the magistrate. Requested sanctions were initially denied.
 
 
 38
 The plaintiffs continuing their efforts toward meaningful discovery deposed more individuals including "in-house counsel" Rita Burns. The information sought by the plaintiff consisted of the existence or nonexistence of documents in AMC's possession reflecting (1) the computations, diagrams, and charts of the "roll tendency" of AMC's Jeep CJ vehicles; (2) the computer modeling of the Jeep CJ vehicle; (3) the destruction of a film; and (4) the statistical tabulations on the rollovers of the Jeep CJ vehicles.
 
 
 39
 No one can doubt the relevancy and materiality of such matters if not for trial at least for discovery purposes. Indeed, AMC does not argue relevancy.
 
 
 40
 It was important to the discovery process to first of all determine the existence of such evidence. Once produced, the court could then address the issue of "work product" and "attorney-client privilege." As indicated, AMC prevented such orderly progression of the discovery process. It was only after the judgment of liability that AMC seriously argued "work product" and "attorney-client privilege."
 
 
 41
 The attitude of AMC is reflected in the following colloquy between the attorneys (E.C. Gilbreath-plaintiff and Tilden P. Wright-AMC).
 
 
 42
 Mr. Gilbreath: What you are telling me is that you have produced a person that you say is capable of answering in this area, but you are going to direct him not to answer?
 
 
 43
 Mr. Wright: That's exactly what I am saying.[2]
 
 
 44
 Similar dialogue occurred in the deposition of Ms. Burns at pages 33, 34, 43, 49, 55, 56, 57, 58, 61, 63, 64 and 65.
 
 
 45
 AMC conceded that the refusal to answer the questions was not on the basis of work product but for the reason that, "It's the approach that Mr. Gilbreath has taken by deposing a lawyer...." AMC on appeal changed its position to assert a violation of the "work product" rule.
 
 
 46
 This court in Investors Diversified Industries, Inc. v. Meredith, 572 F.2d 596 (8th Cir.1977) at page 603 stated that "work product" to be protected must have been obtained "in anticipation of litigation or for trial." So also the concept furnishes no shield against discovery of the facts that the adverse party's lawyer has learned, or the person from whom he has learned such facts or the existence or nonexistence of documents, even though the documents themselves may not be subject to discovery. Wright and Miller, Federal Practice and Procedure, Civil Sec. 2023 at 194.
 
 
 47
 The conduct of AMC provided it with the best of two worlds. In the first instance it prevented Ms. Burns from testifying as to the existence or nonexistence of the documents. In the second place it prohibited the trial court the opportunity of determining, in camera or otherwise, whether or not the documents, if indeed they existed, constituted "work product" under the definition of the rule and the teachings of Diversified Industries, Inc. The final chapter to AMC's intrigue would be written should this case be reversed and returned to the trial court for yet further arguments and hearings on discovery. Many more months will elapse before the matter will be finally concluded on its merits.
 
 II. ATTORNEY-CLIENT PRIVILEGE
 
 48
 What has been previously said is equally applicable to the attorney-client privilege. While it is argued that the practice of deposing opposing counsel "in-house" or otherwise is a practice to be used sparingly and within narrow limits, nonetheless in this case it does not seem inappropriate given the barriers presented by AMC to true discovery. While "in-house" counsel are entitled to the same privilege as private counsel, nonetheless the structure of a large corporation such as AMC provides a unique opportunity to hide matters otherwise discoverable.
 
 
 49
 In Diversified Industries, Inc., supra, Judge Heaney, speaking for an en banc court, set forth five tests to determine if an attorney-client privilege is applicable to an employee's communication: (1) the communication was made for the purpose of securing legal advice; (2) the employee making the communication did so at the direction of his corporate superior; (3) the superior made the request so that the corporation could secure legal advice; (4) the subject matter of the communication is within the scope of the employee's corporate duties; and (5) the communication is not disseminated beyond those persons who, because of the corporate structure, need to know its contents.
 
 
 50
 The court stated, "We note, moreover, that the corporation has the burden of showing that the communication in issue meets all of the above requirements."
 
 
 51
 AMC did not attempt to meet its burden. It chose to stand on its claim of privilege without more. By its inaction it stultified the process by preventing the trial court from assessing any proffered evidence as to the claimed privilege. The ultimate result has been inordinate delay in the resolution of this matter to the detriment of the parties and to the system of justice itself.
 
 
 52
 The thrust of the majority opinion implicitly places the blame for this prolonged litigation on this plaintiff. In the context of this case I am unable to agree that this plaintiff is at fault.
 
 
 53
 The importance of this case is underscored by the filing of amicus briefs for the Motor Vehicle Manufacture Association of the United States, Inc., Defense Research Institute, Inc., American College of Trial Lawyers, and 31[3] of the largest corporations in the United States (the Who's Who of the corporate and business world), all of which urge reversal of this case.
 
 
 54
 To reverse this case would be to sanction the type of conduct which AMC took here--that is, the prevention of the trial court in making an independent and detached in camera inspection of those documents claimed to be "work product" or "privileged." The courts and not the attorneys for parties should be the final arbitrator of whether such claims are valid or not.
 
 
 55
 Diversified Industries, Inc. v. Meredith, supra, offers the best hope for judicial resolution of these matters. The defendant has ignored its responsibility under that case.
 
 
 56
 The majority opinion will provide added incentive to corporate as well as noncorporate counsel to hide from judicial scrutiny otherwise discoverable documents.
 
 III. CONCLUSION
 
 57
 In sum, the court should approve the sanction of directed verdict of liability, extreme as it may be, for the reason that AMC willfully failed to properly present their claim of "work product" and "attorney-client privilege" to the trial court for proper consideration. The mere existence or nonexistence of the requested documents is neither "work product" nor "attorney-client privilege." While their contents may fall within such definitions, AMC by its conduct prevented an orderly determination of the issue, in camera or otherwise. It willfully refused to meet the burden imposed by this circuit in Diversified Industries, Inc., supra, and should not now be permitted to complain.
 
 
 
 *
 The Honorable Richard H. Battey, United States District Judge for the District of South Dakota, sitting by designation
 
 
 [1]
 Fed.R.Civ.P. 30(b)(6) provides that a party may name a corporation as the deponent "and describe with reasonable particularity the matters on which examination is requested." The corporation then must designate a person to testify on behalf of the corporation and the matters on which that person will testify
 
 
 [2]
 Burns declined to disclose whether she knew of the existence or nonexistence of documents in AMC's possession reflecting (1) the computations, diagrams, and charts of the "rollover tendency" of AMC's Jeep CJ vehicles; (2) the computer modeling of the Jeep CJ vehicles; (3) the destruction of a film; and (4) the statistical tabulations on the rollovers of Jeep CJ vehicles. Burns acknowledged that she was aware of the existence of documents reflecting tests made by independent agencies retained by AMC, and the existence of "35,000 documents [that] recently surfaced with reference to the Foreman case." But she refused to answer plaintiffs' follow-up questions concerning the contents of those documents. During Burns' first deposition, the plaintiffs also asked her whether AMC maintained a list of all lawsuits filed against AMC. Burns declined to answer. At Burns' second deposition, plaintiffs' counsel revealed that he possessed such a list and requested Burns to authenticate it. Burns declined, saying that she did not possess the necessary knowledge to do so. She offered, however, to have someone at AMC compare the list with AMC's records in an attempt to authenticate it
 
 
 [3]
 The parties do not dispute that a corporation's "in-house counsel" is afforded the same protection as "outside counsel" with respect to the work-product doctrine and the attorney-client privilege. See generally Upjohn Co. v. United States, 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 854 (1981)
 
 
 [4]
 Briefs of amici curaie urging reversal were filed by Defense Research Institute, Inc. (in support of AMC's position), Motor Vehicle Manufacturers Association of the United States, Inc. and Product Liability Advisory Council, Inc. (also in support of AMC's position), and American College of Trial Lawyers (expressing no view on the propriety of taking the deposition of opposing counsel, but in support of AMC's position with respect to the attorney-client privilege and the work-product doctrine). In addition, thirty-one corporations were granted leave to join as amici curaie and adopt the American College of Trial Lawyers' brief in support of AMC
 
 
 [5]
 See, e.g., Hollins v. Powell, 773 F.2d 191 (8th Cir.1985), cert. denied, --- U.S. ----, 106 S.Ct. 1635, 90 L.Ed.2d 181 (1986); Hunt International Resource Corp. v. Binstein, 98 F.R.D. 689 (N.D.Ill.1983); In re Arthur Treacher's Franchise Litigation, 92 F.R.D. 429 (E.D.Pa.1981); Walker v. United Parcel Services, 87 F.R.D. 360 (E.D.Pa.1980)
 
 
 [6]
 We note, however, that the district court mischaracterized AMC's argument. AMC did not contend that the documents themselves were protected by the privilege or that they were privileged because they were in the possession of the Litigation Department. Although Burns' standard response to the questions can be interpreted as taking such a position, both Burns and AMC's trial counsel clarified their position with respect to some of the documents. They argued that Burns' knowledge of those documents is protected by the privilege because her knowledge of the documents results from communications with AMC employees in preparation of this case. In other words, Burns would not have been aware of the existence of those documents had she not entered into confidential conversations in which AMC employees identified the documents. See United States v. Hankins, 631 F.2d 360, 365 (5th Cir.1980). We express no view as to this argument
 
 
 [7]
 We cannot agree with the dissent that AMC should be punished merely because it took a position opposite the district court and adamantly stood by that position. AMC risked the possibility of sanctions and took a chance that its position was correct. We do not condone a party's repeated refusals to obey discovery orders, and when that party is wrong sanctions should be imposed. But AMC is right in this case. If we were to impose sanctions in these circumstances, as the dissent suggests, we would hold that a party should be sanctioned for disagreeing with the district court. This we cannot agree to. If plaintiffs' counsel can demonstrate, as he suggested during Burns' second deposition and during oral argument, that AMC has not fully and truthfully complied with document requests, then he should move for sanctions on that basis--not on the basis that opposing counsel repeatedly refused to reveal her work product
 The dissent concludes that AMC's conduct "prohibited the trial court the opportunity of determining, in camera or otherwise, whether or not the documents, if indeed they exist, constituted 'work product.' " Infra p. 17. This position ignores two very important points. First, there was no need in this case for the trial court to examine the documents. AMC has not argued and we do not hold that the documents themselves are protected as work product. Burns testified: "Judge, my--our position is not that the documents are attorney client privilege or work product. It's the approach that Mr. Gilbreath has taken by deposing a lawyer * * * * " Burn's Second Deposition Transcript at 37. Burns and AMC's trial counsel later clarified their position that in-house counsels' mere acknowledgement of the existence of the documents would reveal her mental impressions or confidential communications, or both. E.g., id. at 37-38 (both work-product doctrine and attorney-client privilege relied on with respect to documents reflecting computations, diagrams, and charts of the rollover tendency of CJ vehicles). Second, and just as important, several factors exist in this case that support AMC's argument that plaintiffs' counsel was attempting to discover opposing counsel's mental impressions concerning the importance or unimportance of those documents. Those factors are that plaintiffs' counsel had in his possession some of the very documents about which he was inquiring, that AMC indicated that it previously had produced the documents, that AMC offered to acknowledge the existence of the documents through the deposition of someone other than in-house counsel, and that plaintiffs' counsel nonetheless persisted in asking opposing counsel these questions. We cannot say that AMC's conduct in these circumstances was improper.
 
 
 [1]
 (6) A party may in his notice and in a subpoena name as the deponent a public or private corporation or a partnership or association or governmental agency and describe with reasonable particularity the matters on which examination is requested. In that event, the organization so named shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which he will testify. A subpoena shall advise a non-party organization of its duty to make such a designation. The persons so designated shall testify as to matters known or reasonably available to the organization. This subdivision (b)(6) does not preclude taking a deposition by any other procedure authorized in these rules
 
 
 [2]
 Dawkins Deposition, p. 73
 
 
 [3]
 Aluminum Company of America
 American Cyanamid Company
 Atlantic Richfield Company
 Bethlehem Steel Corporation
 Celenese Corporation
 Chevron Corporation
 The Coca-Cola Company
 Dart & Kraft, Inc.
 Deere & Company
 Delta Air Lines, Inc.
 The Greyhound Corporation
 Hershey Foods Corporation
 International Business Machines Corp.
 Kraft, Inc.
 Lukens, Inc.
 Mobil Corporation
 Monsanto Company
 National Steel Corporation
 Owens-Illinois, Inc.
 PPG Industries, Inc.
 RCA Corporation
 Reynolds Metals Company
 Robertshaw Controls Company
 Sears Roebuck & Co.
 Texaco, Inc.
 Texas Instruments, Inc.
 Transtechnology Corporation
 TRW, Inc.
 United States Steel Corporation
 Westinghouse Electric Corporation
 Westvaco Corporation