# IN THE SUPREME COURT OF IOWA

No. 23–1115

Submitted April 10, 2024—Filed May 17, 2024

**JEFFREY PETERZALEK** and **MOLLY WEBER,**

Plaintiffs,

vs.

**IOWA DISTRICT COURT FOR POLK COUNTY,**

Defendant.

---

Certiorari to the Iowa District Court for Polk County, Robert Hanson, Judge.

Two attorneys seek certiorari review of an order declining to quash subpoenas for the attorneys' depositions. **WRIT SUSTAINED AND REMANDED.**

May, J., delivered the opinion of the court in which all justices joined.

Brenna Bird, Attorney General; Eric H. Wessan, Solicitor General; Patrick C. Valencia, Deputy Solicitor General; Alexa Den Herder (argued), Assistant Solicitor General; and Lindsey L. Browning, Assistant Attorney General, for plaintiffs.

Amy Beck (argued) of Fiedler Law Firm, P.L.C., Johnston, and Kellie L. Paschke of Skinner & Paschke, PLLC, West Des Moines, for defendant.

**MAY, Justice.**

This case is about depositions of attorneys. We consider whether parties to civil disputes may depose attorneys who have provided legal services to an opposing party. We conclude that those depositions should not be wholly prohibited. But we adopt the Eighth Circuit's *Shelton* test, which greatly limits the circumstances in which opposing counsel may be deposed. *Shelton v. Am. Motors Corp.*, 805 F.2d 1323, 1327 (8th Cir. 1986). We also address other protective measures that may be appropriate when attorney depositions are sought.

## I. Background.

This appellate case arises from a discovery dispute in a pending district court case. The plaintiff in the district court case is Charis Paulson. The defendants are Paulson's employers, the State of Iowa and the Iowa Department of Public Safety (DPS).

Paulson began working for DPS in 1994. She began her work as a special agent. Over the years, Paulson was promoted several times. By 2012, she was the first woman to hold the position of a director at DPS.

Still, Paulson alleges that she has been treated less favorably than her male counterparts. In March 2021, Paulson filed a civil rights complaint with the Iowa Civil Rights Commission (ICRC). In September, the ICRC issued a right-to-sue letter to Paulson. In December, Paulson commenced suit in the district court. As mentioned, Paulson named the State of Iowa and DPS as defendants. Paulson's petition alleged that the defendants subjected her to gender-motivated discrimination and retaliation.

In early 2023, Paulson subpoenaed two attorneys for deposition. The subpoenaed attorneys were Molly Weber and Jeffrey Peterzalek. Weber had previously served as an assistant attorney general, although by the time the

subpoenas were served, she had moved on to other employment. Peterzalek continued to serve as an assistant attorney general, as he does today.

Both Weber and Peterzalek have represented DPS in different capacities. Weber has represented DPS in its current dispute with Paulson. More particularly, Weber assisted DPS with its response to Paulson's civil rights complaint before the ICRC.

Peterzalek has not represented DPS in its dispute with Paulson. But Peterzalek has represented DPS and its leaders in a variety of other matters over the course of almost twenty years. For instance, since 2013, Peterzalek has represented Paulson, who is a defendant in an employment-related suit brought by a former DPS employee, Larry Hedlund. The Hedlund litigation is currently proceeding as a separate district court case.

Weber and Peterzalek moved to quash Paulson's deposition subpoenas. Alternatively, Weber and Peterzalek requested entry of "an appropriately restrictive protective order pursuant to Iowa Rule of Civil Procedure 1.504(1)(*a*)" to govern their depositions. In support of their motion, Weber and Peterzalek argued that allowing Paulson to depose them could lead to the disclosure of privileged information as well as violations of their ethical duty to maintain client confidences.

The district court declined to quash the subpoenas. But the court ordered that "the depositions of Peterzalek and Weber shall be sealed in a manner compliant" with a previously-entered confidentiality order. The court did not order any other limits on the depositions.

Weber and Peterzalek filed a petition for writ of certiorari with our court. We granted the writ and retained the case. Our certiorari review is for correction of errors at law. *State Pub. Def. v. Iowa Dist. Ct.*, 747 N.W.2d 218, 220 (Iowa 2008).

**II. Issues Presented.**

In their briefs before this court, Weber and Peterzalek raise four issues. They argue that:

1. We should adopt the *Shelton* test, which narrowly limits the circumstances in which opposing counsel may be deposed.

2. We should conclude that Weber cannot be deposed.

3. We should conclude that Peterzalek cannot be deposed.

4. Alternatively, if we permit deposition of either attorney, we should impose substantial limitations.

We will discuss these issues in turn. Before proceeding to these briefed issues, however, we address two other matters.

A. *Weber and Peterzalek.* First, on our own motion, we note the following concerning Weber and Peterzalek. As mentioned, Weber no longer works for the attorney general's office. In 2021, Weber joined the judicial branch as Legal Counsel to State Court Administration. She continues to serve in that role. But Weber has taken no part in our court's consideration of this case.

Peterzalek continues to serve as an assistant attorney general. In his role as assistant attorney general, Peterzalek has provided legal services to the judicial branch and its employees. But Peterzalek has taken no part in our court's consideration of this case.

B. *Paulson's motion.* Next, we address a motion that Paulson filed with this court shortly before oral argument. Attached to the motion were two recent filings from the Hedlund litigation, which is now pending in the district court. The filings were marked as "Exhibit 1" and "Exhibit 2." The motion asked leave for Paulson to "supplement the appendix" by "adding Exhibits 1 and 2."

We deny Paulson's motion. Generally speaking, our review is limited to the record made in "the district court case from which the appeal is taken." Iowa R.

App. P. 6.801. This rule applies equally to certiorari proceedings like this one. *See, e.g., Pederson v. Meyer*, No. 13–1600, 2014 WL 3930462, at *1 n.3 (Iowa Ct. App. Aug. 13, 2014) (per curiam) (applying rule 6.801 in a certiorari proceeding). And while the rule has some exceptions, *see* Iowa R. App. P. 6.801(*d*)–(*e*), none of those exceptions apply here. So our review is limited to the record made in Paulson's case against DPS. That record does not include the Hedlund filings that were attached to Paulson's motion. Because those filings are not part of the record here, we should not consider them here, and they should not be added to the appendix. *See In re M.M.*, 483 N.W.2d 812, 815 (Iowa 1992) ("We limit our review to the record made [below].");  *In re Marriage of Keith*, 513 N.W.2d 769, 771 (Iowa Ct. App. 1994) ("We are limited to the record before us and any matters outside the record on appeal are disregarded."); *see also State v. Washington*, 832 N.W.2d 650, 655–56 (Iowa 2013) ("However, '[t]he general rule is that it is not proper for the court to consider or take judicial notice of the records of the same court in a different proceeding without an agreement of the parties.'" (alteration in original) (quoting *Leuchtenmacher v. Farm Bureau Mut. Ins.*, 460 N.W.2d 858, 861 (Iowa 1990))); *State v. Wooten*, No. 20–0716, 2021 WL 810930, at *1 (Iowa Ct. App. Mar. 3, 2021) (noting that it "is inappropriate" to include documents outside of the record in the appendix).

With those issues resolved, we turn to the questions raised in the briefs.

**III. Analysis.**

**A. The *Shelton* Test.** As noted, Weber and Peterzalek ask us to adopt the *Shelton* test, 805 F.2d at 1327. We begin our analysis of this request with a review of the *Shelton* case itself.

1. Shelton. *Shelton v. American Motors Corporation* arose from a vehicular accident. *Id.* at 1324. A woman was killed when her vehicle overturned. *Id.* The woman's parents sued the vehicle's manufacturer. *Id.* During discovery, the

plaintiffs sought to depose one of the manufacturer's attorneys. *Id.* at 1325. The attorney was "employed by" the manufacturer "in its Litigation Department," and she "was assigned specifically to" the parents' case as the manufacturer's "supervising 'in-house counsel.' " *Id.* The manufacturer moved to quash the deposition, but a magistrate judge denied the motion. *Id.* The plaintiffs then deposed the attorney. *Id.* During the deposition, the attorney refused to answer questions about the existence of certain documents (which, if existed, should have been produced in written discovery). *Id.* The attorney based her refusals on the work-product doctrine and the attorney–client privilege. *Id.* Motion practice followed. *Id.* The attorney was deposed again. *Id.* This time, a magistrate judge presided over the deposition. *Id.* Again, the attorney was asked about the existence or nonexistence of certain documents. *Id.* Again, the attorney declined to answer. *Id.* The attorney's "typical response" was, "Any information I have concerning documents which might possibly be responsive to your question, I've acquired solely through my capacity as an attorney for [the manufacturer] in my efforts to find information which would assist me in defending the [manufacturer] in litigation, and therefore, I decline to [answer]." *Id.* The manufacturer's trial counsel supplemented the attorney's responses by raising objections under the work-product doctrine and attorney–client privilege. *Id.* at 1325–26. The magistrate judge overruled the objections and directed the attorney to answer the questions. *Id.* at 1326. Even so, the manufacturer directed the attorney not to answer. *Id.* More motion practice followed. *Id.* Ultimately, the district court concluded that no privilege justified the attorney's repeated refusals to answer. *Id.* And so the court entered a substantial discovery sanction against the manufacturer—namely, a default judgment on the issue of liability. *Id.* The manufacturer sought an interlocutory appeal. *Id.*

The United States Court of Appeals for the Eighth Circuit heard the manufacturer's appeal. *Id.* The court's analysis focused largely on the question of when it is appropriate for parties to depose opposing counsel. *Id.* The court discussed several concerns about this "increasingly popular" discovery practice. *Id.* at 1327. We repeat those concerns verbatim:

> In recent years, the boundaries of discovery have steadily expanded, and it appears that the practice of taking the deposition of opposing counsel has become an increasingly popular vehicle of discovery. To be sure, the Federal Rules of Civil Procedure do not specifically prohibit the taking of opposing counsel's deposition. *See* Fed. R. Civ. P. 30(a) (a party may take the deposition of "any *person*"). We view the increasing practice of taking opposing counsel's deposition as a negative development in the area of litigation, and one that should be employed only in limited circumstances.

> Undoubtedly, counsel's task in preparing for trial would be much easier if he could dispense with interrogatories, document requests, and depositions of lay persons, and simply depose opposing counsel in an attempt to identify the information that opposing counsel has decided is relevant and important to his legal theories and strategy. The practice of forcing trial counsel to testify as a witness, however, has long been discouraged, *see Hickman v. Taylor*, 329 U.S. 495, 513, 67 S. Ct. 385, 394, 91 L. Ed. 451 (1947) (it causes "the standards of the profession [to] suffer"), and recognized as disrupting the adversarial nature of our judicial system, *see id.* at 516, 67 S. Ct. at 396 (Jackson, J., concurring) ("Discovery was hardly intended to enable a learned profession to perform its functions . . . on wits borrowed from the adversary."). Taking the deposition of opposing counsel not only disrupts the adversarial system and lowers the standards of the profession, but it also adds to the already burdensome time and costs of litigation. It is not hard to imagine additional pretrial delays to resolve work-product and attorney–client objections, as well as delays to resolve collateral issues raised by the attorney's testimony. Finally, the practice of deposing opposing counsel detracts from the quality of client representation. Counsel should be free to devote his or her time and efforts to preparing the client's case without fear of being interrogated by his or her opponent. Moreover, the "chilling effect" that such practice will have on the truthful communications from the client to the attorney is obvious.

*Id.* (footnote omitted) (alteration and omission in original).

Despite these concerns, the *Shelton* court declined to hold that opposing counsel is "absolutely immune from being deposed." *Id.* Rather, the court "recognize[d] that circumstances may arise in which the court should order the taking of opposing counsel's deposition." *Id.* "But those circumstances should be limited," the court held, "to where the party seeking to take the deposition has shown that (1) no other means exist to obtain the information than to depose opposing counsel; (2) the information sought is relevant and nonprivileged; and (3) the information is crucial to the preparation of the case." *Id.* (citation omitted).

Applying this test to the record before it, the *Shelton* court concluded that "those limited circumstances" were not present. *Id.* For one thing, the plaintiffs were seeking information about what documents were in the manufacturer's possession. That information could be obtained by other means, such as depositions of the manufacturer's employees "who were not attorneys in its Litigation Department." *Id.* Also, if the manufacturer's attorney were forced to answer the plaintiffs' inquiries, the work-product doctrine would certainly be implicated. *Id.* at 1329. The court observed that:

> In cases that involve reams of documents and extensive document discovery, the selection and compilation of documents is often more crucial than legal research. We believe [the attorney's] selective review of [the manufacturer's] numerous documents was based upon her professional judgment of the issues and defenses involved in this case. This mental selective process reflects [the attorney's] legal theories and thought processes, which are protected as work product. Moreover, in these circumstances we believe that any recollection [the attorney] may have of the existence of documents in [the manufacturer's] possession likely would be limited to those documents she has selected as important to her legal theories concerning this case. Thus, contrary to the plaintiffs' argument, the questions asked require more than merely acknowledging the existence of certain documents. If [the attorney] were compelled to acknowledge whether specifically described documents exist, she necessarily would reveal her mental selective process. [The attorney's] acknowledgment would indicate to her opponent that she had reviewed the document and that, since it was

important enough to remember, she may be relying on it in preparing her client's case.

*Id.* (citations omitted).

"Consequently," the court held that when "the deponent is opposing counsel [who] has engaged in a process of selecting and compiling documents in preparation for litigation, the mere acknowledgment of the existence of those documents would reveal counsel's mental impressions, which are protected as work product." *Id.* So the court held that the district court had erred by concluding "that the information sought by the plaintiffs was not protected as work product." *Id.* And so the court reversed the imposition of discovery sanctions. *Id.* at 1329–30.

2. Shelton*'s three-prong test.* We turn now to the central question before us: Should we adopt the *Shelton* court's three-prong test? We answer that question in the affirmative. Like the *Shelton* court, we believe that the "harassing practice of deposing opposing counsel (unless that counsel's testimony is crucial and unique) appears to be an adversary trial tactic that does nothing for the administration of justice but rather prolongs and increases the costs of litigation, demeans the profession, and constitutes an abuse of the discovery process." *Id.* at 1330. We believe that *Shelton*'s three-prong test appropriately addresses these concerns. *See State v. Leedom,* 938 N.W.2d 177, 194–95 (Iowa 2020) (citing *Shelton* with approval); *cf. Fenceroy v. Gelita USA, Inc.,* 908 N.W.2d 235, 249–50 (Iowa 2018) (Waterman, J., dissenting with Mansfield and Zager, JJ., joining) (advocating for adoption of *Shelton*). Accordingly, we now join the many jurisdictions that have adopted *Shelton*'s three-prong test. *E.g., Nationwide Mut. Ins. v. Home Ins.,* 278 F.3d 621, 628–29 (6th Cir. 2002) (requiring *Shelton*'s three-prong test); *Thiessen v. Gen. Elec. Cap. Corp.,* 267 F.3d 1095, 1112 (10th Cir. 2001) ("[T]he parties and the court agreed [the issue] was controlled by the

rule announced in [*Shelton*]."); *De Alba v. Velocity Invs., LLC*, No. 21-CV-547-AJB-WVG, 2022 WL 3327382, at *4 (S.D. Cal. Aug. 10, 2022) ("*Shelton* is the seminal case on the depositions of attorneys and sets forth a three-part framework to guide courts' analyses, which district courts within the Ninth Circuit have adopted."); *Brown v. Saint-Gobain Performance Plastics Corp.*, No. 16-cv-242-JL, 2021 WL 6428171, at *1 (D.N.H. Dec. 7, 2021) (calling the *Shelton* test "requisite," and granting a protective order); *Ex parte Indus. Dev. Bd. of Montgomery*, 42 So. 3d 699, 712 (Ala. 2010) ("In the unique context of a party's attempt to prevent the deposition of its counsel, the *Shelton* factors are a practical means of implementing the requirements of Rule 26(b)(1) and evaluating whether there is good cause for the issuance of a protective order under Rule 26(c)."); *Iacono v. Santa Elena Holdings, LLC*, 271 So. 3d 28, 30 (Fla. Dist. Ct. App. 2018) ("Where the deposition of opposing counsel is it issue, the party seeking such a deposition has the burden of meeting the three-factor test outlined in [*Shelton*]."); *Airy's, Inc. v. Hill*, 193 N.E.3d 107, 111 (Ill. App. Ct. 2021) (adopting the *Shelton* test); *McMurry v. Eckert*, 833 S.W.2d 828, 830 (Ky. 1992) ("In our view, [*Shelton* and *Hickman*, 329 U.S. at 512–13,] address this issue appropriately and provide the proper standard."); *Club Vista Fin. Servs. v. Eighth Judicial Dist. Ct.*, 276 P.3d 246, 247 (Nev. 2012) (en banc) (adopting "the framework espoused" in *Shelton*); *Desmond v. Gains*, 183 N.E.3d 1229, 1243–44 (Ohio Ct. App. 2022) (adopting the *Shelton* test); *c.f. Nguyen v. Excel Corp.*, 197 F.3d 200, 208–09 (5th Cir. 1999) (deciding—regardless of whether it applied *Shelton* or not—the district court did not abuse its discretion by allowing the plaintiffs to depose defense counsel); *McDill v. Bd. of Pardons & Paroles*, No. 2:18-cv-597-MHT-SMD, 2021 WL 6883424, at *3 (M.D. Ala. June 24, 2021) ("Without clear direction from the Eleventh Circuit otherwise, the undersigned will apply the *Shelton* test . . . ."); *Duke Energy Carolinas, LLC v. NTE Caroinas II,*

*LLC*, No. 3:19-CV-00515-KDB-DSC, 2021 WL 5826786, at \*2 (W.D.N.C. Dec. 8, 2021) ("While *Shelton* has not been adopted by the Fourth Circuit, it has been applied by District Courts in the circuit, including in this Court."); *OCI Chem. Corp. v. Aon Corp.*, No. CV054003935S, 2007 WL 3087958, at \*1 (Conn. Super. Ct. Oct. 3, 2007) ("While *Shelton* is not binding on this court[,] it is persuasive in providing guidance." (citation omitted)); *Blue Ridge Pediatric & Adolescent Med., Inc. v. First Colony Healthcare, LLC*, No. 11 CVS 127, 2012 WL 3249553, at \*11 (N.C. Super. Aug. 9, 2012) ("While not binding on this Court, *Shelton* and its progeny offer guidance to the Court in deciding this motion."). *Contra, e.g.*, *In re Subpoena Issued to Dennis Friedman*, 350 F.3d 65, 71–72 (2d Cir. 2003) (rejecting the *Shelton* approach); *Munn v. Bristol Bay Hous. Auth.*, 777 P.2d 188, 196 (Alaska 1989) (same); *Liberty Petroleum Realty, LLC v. Gulf Oil, L.P.*, 164 A.D.3d 401, 404 (N.Y. App. Div. 2018) (same).

**B. Molly Weber.** With the *Shelton* test in hand, we now turn to the facts before us. The first question is whether *Shelton* applies to Molly Weber. Paulson notes that although Weber represented DPS in its response to Paulson's administrative claim, Weber does not *currently* represent DPS in Paulson's pending district court case. And so, Paulson argues, *Shelton* shouldn't apply to Weber.

We reach a different conclusion. We agree with Paulson that *Shelton*'s stringent test was primarily intended to "protect against the ills of deposing opposing counsel in a pending case which could potentially lead to the disclosure of the attorney's litigation strategy." *Pamida, Inc. v. E.S. Originals, Inc.*, 281 F.3d 726, 730 (8th Cir. 2002). And so we agree that, generally speaking, *Shelton* does not apply to attorneys who have represented a client only "in a completed case." *Id.* But we do not believe that this limitation applies to Weber. Weber assisted DPS in responding to the administrative complaint through which Paulson

raised the same allegations that are still being litigated in the district court. We do not view that administrative process as a separate completed case. Rather, it was the first phase of the ongoing litigation between Paulson and DPS. *See* Iowa Code § 216.16 (2023) (requiring exhaustion of administrative remedies prior to commencement of a district court action). And so we view Weber as opposing counsel for purposes of Paulson's ongoing civil rights dispute with DPS. Therefore, the *Shelton* test applies to Weber.

This is not the end of the analysis, though. As explained, the *Shelton* court did not adopt a categorical ban on depositions of opposing counsel. 805 F.2d at 1327. Rather, *Shelton* held that opposing counsel could not be deposed unless "the party seeking to take the deposition has shown that (1) no other means exist to obtain the information than to depose opposing counsel; (2) the information sought is relevant and nonprivileged; and (3) the information is crucial to the preparation of the case." *Id.* (citation omitted).

Paulson claims that these requirements are met. Paulson claims that Weber is an important witness because—when DPS responded to Paulson's administrative complaint—DPS ("through Weber") took "unusual" and improper steps, such as obtaining a confidential investigative report from DAS and then filing an "*ex-parte* motion to conceal and limit access" to the investigative report. Paulson claims that these "unusual" steps amounted to acts of discrimination and retaliation by DPS. Paulson believes Weber should be deposed about how these steps occurred, including how Weber obtained the report and why Weber tried to limit access to the report. Paulson also believes Weber should be deposed about whether "other civil rights complaints were treated similarly" by DHS. In Paulson's view, these kinds of inquiries are appropriate under *Shelton.*

We disagree. As explained, *Shelton*'s second prong prohibits the deposition of opposing counsel when "the information sought" is privileged. *Id.* at 1327. And

here, Paulson wants to depose Weber about Weber's collection of particular documents—as well as Weber's filing of a particular motion—all as part of Weber's defense of DPS. These inquiries would be quite similar to those that the *Shelton* court found unacceptable. 805 F.2d at 1329. As in *Shelton*, Weber could not answer Paulson's questions without revealing the mental processes that Weber employed when defending her client. *Id.* As in *Shelton*, Paulson's inquiries would tread heavily on the work-product doctrine. *Id.*

Also, *Shelton*'s first prong prohibits the deposition of opposing counsel unless "no other means exist" to obtain the information sought. *Id.* at 1327. But Paulson has not shown that "no other means exist" to obtain information about how DPS handles civil rights complaints, including Paulson's own complaint. *Id.* Rather, it appears that those topics could be adequately explored through interrogatories or depositions of other witnesses.

So we conclude that the *Shelton* test precludes Weber's deposition. Paulson's subpoena to Weber should be quashed.

**C. Jeffrey Peterzalek.**

1. *The* Shelton *test.* With Weber's situation now resolved, we turn to Peterzalek. We first consider whether the *Shelton* three-prong test applies to Peterzalek. We conclude it does not.

As explained, the *Shelton* test applies only to opposing counsel in an ongoing dispute. *See Pamida,* 281 F.3d at 730. But Peterzalek has not represented DPS in its ongoing civil rights dispute with Paulson. Indeed, as Paulson emphasizes, Peterzalek has been counsel for Paulson in another matter. So the attorney general's office has appropriately "walled" Peterzalek "off" from any involvement in Paulson's dispute with DPS. As to Paulson, then, Peterzalek is not "opposing counsel." And so the *Shelton* test does not apply to Peterzalek.

2. *Other limits on attorney depositions.* Although we conclude that the *Shelton* test does not apply to Peterzalek, this does not end the analysis. Even when the *Shelton* test does not apply, it may still be appropriate to prohibit or at least limit depositions of attorneys. When evaluating these issues, courts should look to three sources of authority and guidance.

First, Iowa Rule of Civil Procedure 1.504 affords the district court "broad discretion to craft" appropriate protective orders. *Sioux Pharm, Inc. v. Eagle Lab'ys, Inc.,* 865 N.W.2d 528, 537 (Iowa 2015). Rule 1.504(1) provides that "[u]pon motion by a party or by the person from whom discovery is sought or by any person who may be affected thereby, and for good cause shown," the court is authorized to "make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Iowa R. Civ. P. 1.504(1). Rule 1.504(1) goes on to provide a nonexclusive list of options for protective orders, including:

- An order that certain discovery "not be had."
- An order that "the discovery may be had only by a method of discovery other than that selected by the party seeking discovery."
- An order "[t]hat certain matters not be inquired into, or that the scope of the discovery be limited to certain matters."

*Id.*

Second, when a party invokes the subpoena power to compel an attorney's deposition, the protections of rules 1.1701 and 1.1702 also apply. *See also* Iowa Rs. Civ. P. 1.1701, 1.1702 (providing protections to subpoena recipients). *See generally In re Dethmers Mfg. Co.*, 985 N.W.2d 806 (Iowa 2023) (discussing these rules). Those protections are heightened when subpoenas are directed to nonparties. *See In re Dethmers Mfg. Co.*, 985 N.W.2d at 815 (emphasizing "the need to protect nonparties").

Finally, even when the *Shelton* three-prong test does not apply, the *concerns* raised in *Shelton* may still be relevant when deciding what protections are appropriate. In many cases, an attorney's relevant knowledge will consist largely of information that falls within the work-product doctrine, the attorney–client privilege, or both. And so, a deposition of the attorney will likely involve numerous "work-product and attorney–client objections." *Shelton*, 805 F.2d at 1327. Working through those objections will "add[] to the already burdensome time and costs of litigation." *Id.* Plus, because depositions are essentially real-time interrogations, privileged information is sometimes inadvertently disclosed despite the most attentive efforts to raise timely objections. Concerns like these impose substantial burdens on attorneys and their clients. Those burdens should be mitigated to the degree practicable. Like the *Shelton* court, we think that attorneys should generally "be free to devote [their] time and efforts to" serving their clients "without fear of being interrogated" by their clients' adversaries. *Id.* Likewise, we think clients should generally feel free to have "truthful communications" with their attorneys without worrying that their secrets may be disclosed through the deposition process. *Id.*

We believe, therefore, that even when the *Shelton* three-prong test does not apply, special considerations are still appropriate when determining whether an attorney should be deposed and, if so, what the scope of the deposition should be. Courts should consider whether the information sought could be obtained through other means, such as depositions of nonattorneys, requests for production of documents, or interrogatories. *Cf. Brandon v. W. Bend Mut. Ins.*, 681 N.W.2d 633, 642 (Iowa 2004) (attorney–client privilege was not waived through attorney's verification of interrogatory answers). And when an attorney's deposition is allowed, it may be appropriate to limit the deposition's scope to

topics on which the attorney can provide relevant testimony without raising significant concerns about the disclosure of privileged information.

With all of this said, we add two caveats. First, there are some circumstances in which the concerns just discussed are far less relevant. In *Squealer Feeds v. Pickering*, for example, we found that a workers' compensation carrier had waived the attorney–client privilege by designating its attorney as an expert. 530 N.W.2d 678, 689 (Iowa 1995) (en banc), *overruled on other grounds by Wells Dairy, Inc. v. Am. Indus. Refrigeration, Inc.*, 690 N.W.2d 38 (Iowa 2004). Likewise, when a client sues their attorney in a malpractice case, the client waives privilege as to the subject matter of the suit. *Cf. State v. Tate*, 710 N.W.2d 237, 241 n.2 (Iowa 2006) (noting that concerns about the attorney–client privilege "disappear[] during postconviction relief proceedings"). In these and similar circumstances, privilege concerns will tend to be far less relevant, and the need for protective measures will be much reduced, if not eliminated. *See Pamida*, 281 F.3d at 732 (holding that the plaintiff impliedly waived the work-product protection by bringing an indemnification suit to recover its attorney fees).

Also, although we have said much about the role of *courts*, nothing we have said is meant to diminish the importance of *counsel*. Counsel has the primary responsibility for managing discovery, including privilege issues. *See* 1 Steven S. Gensler & Lumen N. Mulligan, *Federal Rules of Civil Procedure, Rules and Commentary*, Rule 26, at 798 (2024) [hereinafter *Rules and Commentary*] ("The design of the Federal Rules places discovery in the hands of the parties, at least until it becomes necessary for the judge to become involved."). It is counsel's role to identify and raise privilege concerns in the first instance. It is also counsel's role to work with opposing counsel in good-faith efforts to reach mutually agreeable resolutions of privilege concerns. *See* Iowa Rs. Civ. P.

1.507(1) (requiring the parties to confer regarding discovery), 1.507(2) (requiring good-faith efforts to agree to a proposed discovery plan), 1.507(3)(*d*) (requiring the parties to address privilege issues in the proposed discovery plan), 1.507(3)(*e*) (requiring the parties to propose limitations on discovery), 1.507(3)(*f*) (requiring the parties to propose any "orders that the court should issue under rule 1.504"). Of course, this does not mean that opponents will always agree about discovery issues. There will still be times when "it becomes necessary for the judge to become involved." *Rules and Commentary*, Rule 26, at 798. Even so, counsel must make good-faith efforts to minimize the court's role in discovery. Iowa R. Civ. P. 1.501(3) ("Discovery must be conducted in good faith . . . ."). This is reflected in our requirement that "[a]ny discovery motion presented to the court must include a certification that the movant has in good faith personally spoken with or attempted to speak with other affected parties in an effort to resolve the dispute without court action." *Id.* ("The certification must identify the date and time of any conference or attempts to confer."); *accord id.* rs. 1.504(3) (imposing similar requirements regarding motions for protective orders), 1.517(5) (imposing similar requirements for any motion "relating to depositions, discovery, or discovery sanctions").

3. *Resolution as to Peterzalek.* With these principles in mind, we now apply them to Peterzalek. Based on the record before us, we agree with Paulson that Peterzalek should be subject to deposition as to at least some matters. The record shows that Peterzalek likely has nonprivileged information that is directly relevant to Paulson's employment claims. The record shows that Paulson and Peterzalek worked together on a broad range of matters over a period of almost two decades. For instance, Paulson and Peterzalek worked together on training for DPS personnel concerning harassment and discrimination. Based on these and other experiences, Peterzalek has gained knowledge about Paulson's

education, experience, intelligence, capacity for strategic planning, leadership skills, personality, and work ethic. On at least one occasion, Peterzalek has expressed positive views about Paulson's qualifications by writing a letter of recommendation on Paulson's behalf. Topics like these would be fair game for a deposition of Peterzalek.

What we cannot say, though, are the appropriate boundaries for Peterzalek's deposition. For instance, Paulson claims that Peterzalek has substantial information about other legal actions or complaints that have been brought by other DPS employees against DPS. But we cannot pass on whether Peterzalek should be deposed about those claims. The record does not show whether the information sought by Paulson could or should be obtained by other means, such as an interrogatory answer or deposition of DPS officials. Nor can we determine what privilege concerns would be implicated by deposing Peterzalek about these matters. So we leave these questions open. The parties—through counsel—should attempt to resolve these questions in the first instance. No dispute should be brought to the district court unless and until counsel have made appropriate good-faith efforts to discuss the matter and resolve it "without court action." *Id.* r. 1.501(3).

Before concluding, we mention one last issue that is raised in Paulson's brief. As noted, Peterzalek has represented Paulson in the Hedlund matter since 2013. That representation has prevented Peterzalek from representing DPS in any matter that is adverse to Paulson. From this, Paulson infers that Peterzalek *could not* "possess any privileged information related to this case or Paulson's allegations." We disagree. As just explained, it is Paulson's position that legal actions brought by *other* DPS employees may be relevant to Paulson's case. Indeed, Paulson wants to depose Peterzalek about those other legal actions. It seems quite possible, though, that Peterzalek *could* have privileged information

about those legal actions. Indeed, if Peterzalek represented DPS with regard to those other actions, much of his information about those actions may be protected by the work-product doctrine, the attorney–client privilege, or both. As explained, though, the current record does not allow us to answer those questions. We leave them for resolution by counsel or, if necessary, the district court.

**IV. Disposition.**

We affirm the district court's refusal to quash the subpoena for Peterzalek's deposition. We reverse the district court's refusal to quash the subpoena for Weber's deposition. We remand for further proceedings consistent with this opinion, including the entry of an order quashing the subpoena for Weber's deposition.

**WRIT SUSTAINED AND REMANDED.**