**In re LINERBOARD ANTITRUST LITIGATION.**

**MDL No. 1261.**

United States District Court,
E.D. Pennsylvania.

Sept. 5, 2006.

---

## MEMORANDUM

DuBOIS, District Judge.

Presently before the Court is direct action plaintiffs' ("plaintiffs") letter/motion to compel ("motion to compel") testimony from a Rule 30(b)(6) witness for defendant Temple–Inland, Inc. ("Inland").[1] Plaintiffs initially sought an order compelling the deposition of an Inland corporate designee about: (1) Inland's antitrust compliance policy; (2) Inland's verbal communications with the Federal Trade Commission ("FTC") in connection with an investigation into the linerboard[2]

---

1. The parties have submitted a total of five letter/briefs, only the first of which was docketed. All of those letter/briefs and the attached exhibits constitute the record on the discovery issues addressed in this Memorandum; the submissions not yet filed shall be docketed by the Deputy Clerk with the filing of this Memorandum and Order.

2. Linerboard includes any grade of paperboard suitable for use in the production of corrugated sheets, which are in turn used in the manufacture of corrugated boxes and for a variety of

industry; (3) the factual bases for Inland's assertions in a "White paper" produced to the FTC; and (4) the documents Inland created as part of its internal investigation in response to the FTC inquiry.[3]

Because Inland has agreed to produce a Rule 30(b)(6) witness educated to testify on the first and second topics with some stipulated limitations, the Court need not rule on those portions of the motion to compel. With respect to the remaining topics, the Court denies plaintiffs' motion on the ground that plaintiffs' request is an effort to circumvent the work product doctrine through the mechanism of a Rule 30(b)(6) deposition not warranted by the circumstances with one proviso—by agreement, Inland shall produce an educated Rule 30(b)(6) witness to testify as to Inland's position on specific statements in the White paper. In addition, to the extent that any of the objections made by counsel for Inland at Inland's Rule 30(b)(6) deposition are inconsistent with what is set forth in this Memorandum, plaintiffs' counsel is not precluded from inquiring further on these issues at the second Rule 30(b)(6) deposition.

## I. BACKGROUND

### A. Linerboard Litigation

This antitrust litigation began as a class action involving allegations that a number of U.S. manufacturers of linerboard engaged in a continuing combination and conspiracy in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. The seven lawsuits transferred to this Court for all pretrial proceedings by the Judicial Panel on Multidistrict Litigation (the "JPML") on February 12, 1999 were instituted after an administrative complaint filed by the FTC against Stone Container Corporation ("Stone") was resolved by a consent decree. See *In re Linerboard Antitrust Litig.*, 2000 WL

1475559, at * 1 (E.D.Pa. Oct.4, 2000) (setting forth allegations in FTC complaint and details of consent decree). Inland was among the twelve defendants named in the class action.

By Memorandum and Order dated September 4, 2001, this Court certified two classes of plaintiffs—a sheets class and a box class. *In re Linerboard Antitrust Litig.*, 203 F.R.D. 197, 224 (E.D.Pa.2001). The Court's certification ruling was affirmed by the United States Court of Appeals for the Third Circuit and the Supreme Court denied certiorari. See *Gaylord Container Corp. v. Garrett Paper, Inc.*, 538 U.S. 977, 123 S.Ct. 1786, 155 L.Ed.2d 666 (2003). Following certification of the classes, the parties entered into extended settlement negotiations. On August 26, 2003, this Court approved a partial settlement in the amount of $8 million between the plaintiff classes and Inland and Gaylord Container Corporation ("Gaylord").[4] *In re Linerboard Antitrust Litig.*, 292 F.Supp.2d 631 (E.D.Pa.2003). That settlement, which compromised less than four percent of the classes' total recovery, served as an "ice-breaker" and led to the settlement of the entire class action.

Subsequently, one-hundred and forty entities opted out of the classes certified by the Court by filing Requests for Exclusion on or before June 9, 2003. In addition, these 140 entities opted-out approximately 3,400 subsidiary and affiliate companies. Of the 140 Requests for Exclusion, thirteen groups of opt-outs subsequently filed direct actions alleging both federal and state antitrust claims. The JPML, by orders dated August 6, 2003 and December 8, 2003, transferred the thirteen direct actions, which had been filed in districts throughout the country, to this Court for all pretrial proceedings. See *In re Lineboard Antitrust Litig.*, 443 F.Supp.2d

---

industrial and commercial applications. Corrugated sheets are made by gluing a fluted sheet which is not made of linerboard, known as the corrugating medium, between facing sheets of linerboard; corrugated sheets are also referred to as containerboard. The defendants named in the instant lawsuits are major integrated manufacturers and sellers of linerboard, corrugated sheets, and corrugated boxes.

**3.** Inland has represented to plaintiffs, and plaintiffs do not dispute, that these documents do not exist.

**4.** The $8 million settlement was reduced to $7.2 million in accordance with the terms of the settlement agreement based on the number of parties that subsequently opted-out of the classes.

703, —— 2006 WL 2103855, at *2 (E.D.Pa. 2006). As of the date of this Memorandum, nine of those groups have outstanding claims against Inland and Gaylord; the claims against all other defendants have either been settled or withdrawn. All fact discovery, with limited agreed-upon exceptions, has been completed in the direct actions.

### B. Inland's White Paper

This discovery dispute pertains to an internal investigation conducted by Inland in response to an investigation of the linerboard industry by the FTC. On November 8, 1994, Geoffrey M. Green ("Green"), an attorney at the FTC, sent a letter to Clifford J. Grum ("Grum"), President of Inland, requesting information about Inland's decision to take downtime at its mills in 1993. On January 20, 1995, Inland produced for the FTC twelve boxes of documents and a "White paper" in which Inland responded to seven FTC specifications. These materials and responses were the product of the internal investigation led by Inland's Vice President, General Counsel and Assistant Secretary Steven L. Householder, Esq. ("Householder") and were "submitted voluntarily in lieu of compulsory process." Letter from Steven L. Householder, Esq. to Geoffrey M. Green, Esq., Dated Jan. 20, 1995 (hereinafter "January Letter"), at Inland 030076, Pl.Ex. J.

Pertinent to the instant discovery dispute is Specification 7, in which the FTC asked Inland to:

> State whether any mill [operated by Inland] experienced downtime during 1993 for a period in excess of the time required for maintenance and repair. For each such period of downtime, (a) identify the person(s) who decided to take the downtime, (b) state the date(s) on which the decision was made and (c) describe the reasons underlying the decision to take downtime.

*Id.* at Inland 030111. In its response, Inland explained that "each decision to take downtime was made in order to reduce Inland's excessive inventories" and that this "buildup" posed a "significant threat to Inland's business." *Id.* at Inland 030112. The White paper describes the conditions that led to the inventory buildup in 1993 and explains that "the first half of the year brought further deterioration [of market conditions] . . . exacerbat[ing] the excess inventory on hand at the beginning of the year." *Id.* at Inland 030114.

On June 28, 1993, Ben J. Lancashire ("Lancashire"), Chairman of the Board, sent a memorandum to Grum regarding the need for Inland mills to take downtime. *Id.* at Inland 030139. According to the White paper, "Grum, Lancashire and [William B.] Howes [President and Chief Operating Officer] subsequently met in Austin, Texas on June 30, 1993 on other business and decided that the company would take the downtime recommended in the June 28 memorandum if business conditions did not improve." *Id.* at Inland 030112. Continuing on this subject, the White paper reported that, between July 27, 1993 and December 29, 1993, six of Inland's linerboard mills took a total of 47.5 days of "curtailment" in order "to reduce Inland's inventories of linerboard and medium." *Id.* at 030123, 030111.

By letter dated June 20, 1995, Householder supplemented the specification responses and documents provided in connection with the January letter. Letter from Steven L. Householder, Esq. to Geoffrey M. Green, Esq., Dated June 20, 1995 (hereinafter "June Letter"), at Inland 030058, Pl.Ex. K. The supplemental letter followed an inquiry by the FTC into a telephone call from an employee at Stone to Howes on July 6, 1993. During that telephone conversation, Householder explained, the Stone employee "inquired whether Inland was interested in selling containerboard to Stone." *Id.* According to Householder, Howes did not reply, but said that he would bring the request to the attention of Bart Doney ("Doney"), a member of Inland's containerboard sales group. *Id.* Householder added that: "Mr. Doney and Ron Zimbleman, who deal more regularly with Stone Container as a trading partner of Inland, recall a couple of similar conversations, but they believe to the best of their recollection that Inland never responded to the request." *Id.*

### C. Inland's Production of Discovery to Plaintiffs

Plaintiffs have engaged in thorough discovery of Inland. Inland has produced to plaintiffs everything it provided to the FTC, including: "almost 30,000 pages of documents, every piece of correspondence, [the] 'White paper' prepared by Inland, and transcripts of sworn FTC interviews of Inland executives." Inland Letter/Brief, Apr. 21, 2006, at 1–2. In addition, "Inland has: (1) produced to plaintiffs almost 150,000 ... pages of documents, (2) produced for deposition [ten] Inland employees and former employees, and (3) responded to seven sets of interrogatories plaintiffs have served in this case." *Id.* at 2.

Of particular significance to this discovery dispute, counsel for Inland represented to the Court that plaintiffs have "deposed every decision-maker [at Inland] regarding the key facts in the case." Transcript, Aug. 23, 2006 (hereinafter "Transcript"), at 34:21–22. Specifically, plaintiffs have deposed the five individuals named in the aforementioned portions of the White paper. Howes was deposed on April 19, 2005, Howes Dep., Pl. Ex. C; Lancashire was deposed on March 15, 2005, Zimbleman Dep. at 248, Pl.Ex. A; Grum was deposed in late July or early August 2006, Transcript at 49; Ronald Zimbleman's ("Zimbleman") individual deposition was taken on February 9, 2005, Letter from Counsel Dated August 30, 2006; and Doney was deposed on May 20, 2005. *Id.* In addition, as explained in detail below, Inland produced Zimbleman as a Rule 30(b)(6) witness to testify on thirty noticed topics, including the events relating to Inland's decision to take downtime in 1993, the subject of the White paper. See Plaintiffs' Rule 30(b)(6) Deposition Notice to Temple–Inland, Inc., Def. Ex. F, *incorporating* by *reference*, Plaintiffs' Amended and Consolidated Rule 30(b)(6) Notice to Defendants (hereinafter "Rule 30(b)(6) Notice"), Def. Ex. E.

### D. Inland's Rule 30(b)(6) Deposition

Plaintiffs deposed Inland's Rule 30(b)(6) corporate designee, Zimbleman, on November 15–16, 2005. In the Rule 30(b)(6) Notice, plaintiffs requested that Inland provide an educated witness on a myriad of topics, including "FTC discussions." Rule 30(b)(6) Notice ¶ 20. At that deposition, counsel for plaintiffs and Inland engaged in protracted discussions regarding the scope of the Rule 30(b)(6) deposition and whether Zimbleman was required to divulge what Inland considered to be privileged or otherwise protected information. On several occasions, Zimbleman was instructed by counsel to answer questions in an individual, rather than a corporate, capacity. Plaintiffs have brought to the Court's attention two specific portions of Zimbleman's testimony relating to the White paper as examples of what they consider the deficiencies in the information provided by Zimbleman.

First, counsel for plaintiffs asked Zimbleman about a line in the White paper in which Inland explained that Grum, Lancashire, and Howes decided that Inland would take downtime "if business conditions did not improve." January Letter, at Inland 030112. Plaintiffs assert that they are entitled to Inland's position on the meaning of the phrase "if business conditions did not improve." When counsel for plaintiffs asked Zimbleman about that phrase, counsel for Inland objected and explained that Zimbleman "is not here to provide the company position as to the FTC communications." Zimbleman Dep. at 242:6–7. As a result, counsel for Inland instructed Zimbleman to answer in his "personal capacity." *Id.* at 243:3. At oral argument, counsel for Inland also objected to this question on the ground that it implicated the work product doctrine because, in effect, plaintiffs were asking what Householder, Inland's in-house counsel at that time, meant in drafting that phrase. In response, plaintiffs' counsel agreed that the question was inartful and limited that inquiry to Inland's position on the statement about business conditions. Transcript at 23. That is a proper question.

Second, counsel for plaintiffs asked Zimbleman about a statement in the June Letter, sent by Householder to Green at the FTC— the statement regarding the "couple of similar conversations" with Stone employees. Counsel for Inland objected to the question and, based on counsel's earlier instruction, Zimbleman responded individually, rather than on behalf of Inland. Zimbleman Dep.

at 251. Zimbleman testified that he could not remember, specifically, any similar conversations with Stone in June 1993, but that "there were times I know historically where I was involved in providing [spot] tonnage to them...." *Id.* at 252:5–7.

Plaintiffs' argument regarding the adequacy of Zimbleman's knowledge is not limited to their questions about those particular statements in the White paper. Plaintiffs assert that objections by Inland's counsel at the beginning of Zimbleman's deposition rendered all answers on the internal investigation topic insufficient. As plaintiffs' counsel explained: "Inland took the position at the start of the deposition that they were not going to produce a witness on the FTC investigation...." Transcript at 22:1–3. Plaintiffs have expressed concerns that Inland would "disavow" Zimbleman's testimony on all issues relating to the internal investigation due to counsel's initial objections.[5]

## II. DISCUSSION

At the heart of the parties' dispute is the question of whether Inland's Rule 30(b)(6) witness, as part of his preparation, should be required to speak with Householder, Inland's in-house counsel, and educate himself with the all facts Householder recalls from the internal investigation. According to Inland, Householder's recollection of the internal investigation is not memorialized in any memoranda or notes—all such writings no longer exist. Nevertheless, plaintiffs assert that any additional facts of which Householder has knowledge are discoverable because they are facts known to Inland. As discussed in detail below, the Court considers Householder's recollection of any facts learned during his internal investigation to be so intertwined with mental impressions that it amounts to

opinion work product and is, therefore, not subject to discovery, based on the present state of the record. In so ruling, the Court does not rule that facts within counsel's knowledge are never discoverable. To the contrary, the Court's holding is limited to the circumstances of this case in which there has been extensive discovery of the evidence accumulated in the internal investigation.

### A. The Parties' Arguments

#### 1. *Plaintiffs' Arguments*

Plaintiffs make two principal assertions about the information they seek—they are interested in learning the facts known by Inland, not Householder's mental impressions; and facts are always discoverable, irrespective of the attorney-client privilege and the work product doctrine. Plaintiffs also assert that Inland waived all protections pertaining to the information by disclosing the White paper to the FTC. In the alternative, plaintiffs argue that, at best, the information they seek is fact work product and that they have met their burden of showing a substantial need for this information and that they cannot, without undue hardship, obtain the material from any other source. It is plaintiffs' contention that the facts sought are necessary to clarify and supplement vague and incomplete testimony provided by individual witnesses and to use in the cross-examination of Inland employees at trial.

#### 2. *Inland's Arguments*

Inland disputes all of plaintiffs' contentions, and adds that plaintiffs never included Inland's internal investigation as a deposition topic and that, as a result, Inland should not be required to educate a Rule 30(b)(6) witness on this topic.[6] Also, Inland states that

---

**5.** The Court has not been asked to address the objections interposed by Inland's counsel at Zimbleman's deposition. To the extent that any of these objections are inconsistent with what is set forth in this Memorandum, plaintiffs' counsel is not precluded from inquiring further on these issues at the second Rule 30(b)(6) deposition.

**6.** At oral argument on August 23, 2006, the Court rejected this argument. See Transcript at 91. The noticed topic, "FTC discussions," requested information pertaining to:

Communications [to] and from the Federal Trade Commission ("FTC") or any other government agency relating to the antitrust issues regarding linerboard or medium, as well as any documents produced or received from the FTC or any other government agency regarding linerboard or medium.

Rule 30(b)(6) Notice ¶ 20. The Court concluded that this noticed topic is sufficiently broad to cover Inland's internal investigation. Transcript at 91.

the subject matter of plaintiffs' request "plainly intrudes on the realm of attorney-client privilege and attorney work product" because information obtained by in-house counsel during an internal investigation embodies quintessential protected materials or information. In addition, Inland contends that plaintiffs' waiver argument is unavailing because: (a) Inland has disclosed to plaintiffs everything disclosed to the FTC; (b) the factual bases underlying the assertions in the White paper are available from non-privileged sources which have been the subject of extensive discovery; and (c) reliance on privileged and protected materials in crafting a submission (such as the White paper) does not waive the work product doctrine or the attorney-client privilege when the submission itself is produced.

## B. Analysis

■■■■ In grappling with the issues presented, the Court recognizes that plaintiffs' motion to compel constitutes, in effect, an effort to resolve a tension in the law through the mechanism of a Rule 30(b)(6) deposition. On the one hand, relevant facts are clearly discoverable, even if the information is communicated to counsel. See *Philadelphia v. Westinghouse Elec. Corp.*, 205 F.Supp. 830, 831 (E.D.Pa.1962) ("A fact is one thing and a communication concerning that fact is an entirely different thing."). Moreover, facts "discovered" by corporate counsel during an internal investigation are inherently a part of the corporation's knowledge, because the knowledge of employees is imputed to the corporation. *Gerling Int'l Ins. Co. v. Commissioner*, 839 F.2d 131, 138 (3d Cir.1988); *In re Mifflin Chemical Corp.*, 123 F.2d 311, 315 (3d Cir.1941) ("The knowledge of an ... employee obtained within the sphere of his ... employment will be imputed to the corporation.") (citation omitted). On the other hand, the process by which a corporation "accumulates" its knowledge—namely, an internal investigation—affords certain protections that can preclude the disclosure of confidential communications and documents created by and recollection of counsel as part of that investigation effort. *Upjohn Co. v. United States*, 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981).

Plaintiffs have proposed the use of a Rule 30(b)(6) witness to discover facts within an attorney's knowledge without asking counsel directly. While it is certainly an inventive maneuver, the Court is not persuaded by plaintiffs' position. After briefly outlining the relevant law on attorney-client privilege and the work product doctrine, the Court will address each of plaintiffs' arguments in turn.

### 1. Attorney–Client Privilege and Work Product Doctrine

Federal Rule of Civil Procedure 26(b)(1) governs the scope of discovery in federal courts and provides that "[p]arties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party...." Fed.R.Civ.P. 26(b)(1). Because this litigation involves federal antitrust claims, the federal common law of privilege applies. *Wm. T. Thompson Co. v. Gen. Nutrition Corp., Inc.*, 671 F.2d 100, 103–04 (3d Cir.1982). While both the attorney-client privilege and the work product doctrine function similarly in that they serve as a bar to the discovery of certain information, they have entirely separate functions in the adversarial system. See *Praxair, Inc. v. ATMI, Inc.*, 445 F.Supp.2d 473, 480 n. 9, 2006 WL 2375501, at *6 n. 9 (D.Del.2006) (quoting *Hercules Inc. v. Exxon Corp.*, 434 F.Supp. 136, 150 (D.Del.1977)) ("Attorney client privilege and work product are 'two concepts [that] are treated quite differently and, in the eyes of the law, are independent legal concepts.' ").

### i. Attorney–Client Privilege

■■■ Under Third Circuit law, attorney-client privilege contains the following elements:

(1) the asserted holder of the privilege is or sought to become a client;

(2) the person to whom the communication was made

 (a) is a member of the bar of a court, or his or her subordinate, and

 (b) in connection with this communication is acting as a lawyer;

(3) the communication relates to a fact of which the attorney was informed

(a) by his client,

(b) without the presence of strangers,

(c) for the purpose of securing primarily either

(i) an opinion of law,

(ii) legal services, or

(iii) assistance in some legal proceeding, and

(d) not for the purpose of committing a crime or tort; and

(4) the privilege has been claimed and not waived by the client

*Montgomery County v. MicroVote Corp.,* 175 F.3d 296, 301 (3d Cir.1999) (citing *Rhone–Poulenc Rorer Inc. v. Home Indem. Co.,* 32 F.3d 851, 862 (3d Cir.1994)). The privilege covers communications made by the client as well as the attorney and it "exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice." *Upjohn,* 449 U.S. at 390, 101 S.Ct. 677 (citing *Trammel v. United States,* 445 U.S. 40, 51, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980)).

■ In the corporate context, the privilege applies when a corporate employee, acting at the direction of his corporate superiors, seeks legal advice from or provides information to in-house counsel and the other criteria for privilege are met. *Koen Book Distribs. v. Powell, Trachtman, Logan, Carrle, Bowman & Lombardo, P.C.,* 212 F.R.D. 283, 284 (E.D.Pa.2002) (citing *Upjohn,* 449 U.S. at 389–90, 101 S.Ct. 677). Specifically, in reference to internal investigations, courts have held that "an attorney's investigation [to obtain facts] may constitute a legal service, encompassed by the privilege." *In re Allen,* 106 F.3d 582, 601 (4th Cir.1997; see also *United States v. Rowe,* 96 F.3d 1294, 1297 (9th Cir.1996) *(Upjohn* made "clear that fact-finding which pertains to legal advice counts as 'professional legal services.' ") (citation omitted).

The Court does not rely on attorney-client privilege in denying plaintiffs' motion to com-

pel. Although this issue was raised by the parties in their letter/briefs, counsel did not focus on attorney-client privilege at oral argument. Instead, the focus of the argument was on the work product doctrine. The Court is of the view that the questions presented by the letter/briefs raise classic work product issues and, as a result, the Court decides this dispute on the basis of the work product doctrine only.

*ii. Work Product Doctrine*

■ The work product doctrine, codified by Rule 26(b)(3) of the Federal Rules of Civil Procedure, provides that items prepared in anticipation of litigation are generally protected from discovery by an opposing party. See Fed.R.Civ.P. 26(b)(3). A document is considered to have been prepared in anticipation of litigation if "in light of the nature of the document and the factual situation of the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." *Martin v. Bally's Park Place Hotel & Casino,* 983 F.2d 1252, 1258 (3d Cir.1993) (citing *United States v. Rockwell Int'l,* 897 F.2d 1255, 1266 (3d Cir.1990)). Generally, documents created as part of an internal investigation, such as the one at issue in this case, are considered to be made in anticipation of litigation for the purposes of the work product doctrine.[7] See *Upjohn,* 449 U.S. at 398, 101 S.Ct. 677.

■ For such materials, Rule 26(b)(3) establishes two tiers of protection. Fact work product is discoverable only upon a showing "substantial need" and by demonstrating that one cannot otherwise obtain the "substantial equivalent" of such materials without "undue hardship." Fed.R.Civ.P. 26(b)(3). "Core" or "opinion" work product, which consists of "mental impressions, conclusions, opinions, or legal theories of an attorney," is afforded almost absolute protection. *In re Cendant Corp. Sec. Litig.,* 343 F.3d 658, 663 (3d Cir.2003) (citing Fed.R.Civ.P. 26(b)(3)). The rationale behind this distinction is that "any slight factual content that such items may have is generally out-

---

7. Plaintiffs do not dispute and the Court agrees that Inland's internal investigation occurred "in

anticipation of litigation."

weighed by the adversary system's interest in maintaining the privacy of an attorney's thought processes. . . ." *Sporck v. Peil,* 759 F.2d 312, 316 (3d Cir.1985) (citations omitted). Opinion work product is discoverable "only upon a showing of rare and exceptional circumstances." *In re Cendant,* 343 F.3d at 663.

### 2. *Sufficiency of Zimbleman's Preparation*

 Because the parties dispute the adequacy of Zimbleman's preparation, some background on Rule 30(b)(6) depositions is required. Rule 30(b)(6) provides that, when a party notices a corporation for deposition, the corporation must designate a person to testify on behalf of the corporation "as to matters known or reasonably available to the organization." Fed.R.Civ.P. 30(b)(6). A designee "is not simply testifying about matters within his or her personal knowledge, but rather is 'speaking for the corporation' about matters to which the corporation has reasonable access." *Rainey v. American Forest and Paper Ass'n, Inc.,* 26 F.Supp.2d 82, 94 (D.D.C.1998) (citing *United States v. Taylor,* 166 F.R.D. 356, 361 (M.D.N.C.1996)). Rule 30(b)(6) obligates the corporation "to prepare its designee to be able to give binding answers" on its behalf. *Ierardi v. Lorillard, Inc.,* 1991 WL 158911, at *3 (E.D.Pa. Aug.13, 1991). In terms of witness preparation, the corporation is required to perform a "reasonable inquiry for information." *Beloit Liquidating Trust v. Century Indem. Co.,* 2003 WL 355743, at *2 (N.D.Ill. Feb.13, 2003).

Inland takes the position that Zimbleman was thoroughly prepared for the Rule 30(b)(6) deposition and that it met its obligation of making a "reasonable effort" to gather information. Plaintiffs disagree and argue that Zimbleman was not sufficiently educated because he was required to speak with Householder and to obtain from Householder any additional information not available from other sources, and that he did not do so or was not permitted to testify as to those conversations. It is plaintiffs' position that Householder is aware of facts within Inland's knowledge and that Inland should have educated Zimbleman with those facts because, under Rule 30(b)(6), Inland is obligated to provide a witness educated with all of the corporation's knowledge on designated topics.

In support of this contention, plaintiffs cite two opinions authored by Chief Judge Thomas F. Hogan in connection with the Vitamins Antitrust Litigation. See *In re Vitamins Antitrust Litig.,* 217 F.R.D. 229 (D.D.C.2002) (*"Vitamins II"*); *In re Vitamins Antitrust Litig.,* 216 F.R.D. 168 (D.D.C.2003) (*"Vitamins III"*). Plaintiffs assert that, because Judge Hogan required the defendant corporations to provide witnesses educated with all facts known by the corporation, including all facts learned by counsel as part of the internal investigations that resulted in the production of governmental submissions similar to the White paper at issue in this case, this Court should require Inland's Rule 30(b)(6) witness to do the same. The Court disagrees with plaintiffs' position because the facts of this litigation are dramatically different from those presented to Judge Hogan in *Vitamins II* and *Vitamins III*.

In *Vitamins II*, Judge Hogan ordered two defendants, TCI and TVFU, "to produce 30(b)(6) witnesses who have been thoroughly educated about the conspiracy with respect to any and all facts known, respectively, to TCI and TVFU or their counsel, regardless of whether such facts are memorialized in work product protected documents or reside in the minds of counsel." *Vitamins II,* 217 F.R.D. at 234–35. In the opinion, Judge Hogan adopted the Special Master's conclusion that both defendants had failed to provide Rule 30(b)(6) witnesses that were adequately prepared—they "were inadequately prepared as to facts known only to their companies' counsel, but [ ] also the designees were inadequately prepared as to conspiracy facts not exclusively in the possession of counsel." *Id.* at 233. Judge Hogan also rejected the defendants' argument that the Special Master's recommendation required them to educate a Rule 30(b)(6) witness "with attorney-client privileged material." [8] *Id.* at 234.

8. In rejecting the defendants' argument relating to attorney-client privilege, Judge Hogan ex-

In *Vitamins III*, as in *Vitamins II*, Judge Hogan ordered defendant Bioproducts "to produce one or more Rule 30(b)(6) witnesses who are thoroughly educated with respect to any and all facts known to Bioproducts and its counsel...." *Vitamins III*, 216 F.R.D. at 170. The Special Master concluded that Bioproducts' inability to produce an adequately educated Rule 30(b)(6) witness amounted to a "significant" and "conscious" failure. *Id.* at 173. In particular, the corporate designee testified that he had "no knowledge of the facts" that formed the basis of the information provided to the various government agencies, and the Special Master considered this information to be "material" to the plaintiffs' case. *Id.* Judge Hogan, in requiring Bioproducts to educate its Rule 30(b)(6) witness with facts known to counsel, cited *Paul Revere Life Ins. Co. v. Jafari*, 206 F.R.D. 126 (D.Md.2002), another case in which the district court concluded that the corporate designee was "woefully unprepared" for the Rule 30(b)(6) deposition. *Id.* at 127.

■ This Court declines to follow Judge Hogan's rulings in *Vitamins II* and *Vitamins III* and will not require Inland to produce a Rule 30(b)(6) witness educated by conversations with Householder and document review about the internal investigation because of the material differences between those cases and this litigation. First, the Court concludes that Zimbleman was not "woefully unprepared" for Inland's Rule 30(b)(6) deposition. To the contrary, Zimbleman spent more than two weeks preparing for the deposition, including four to five days reading deposition transcripts. Zimbleman Dep. at 6–7. Zimbleman also specifically identified at least ten individuals currently or formerly employed by Inland with whom he conferred about their testimony or documents prior to testifying as Inland's corporate designee.[9]

*Id.* at 7–10. Additionally, Zimbleman provided detailed answers to almost all of plaintiffs' questions, and to the extent that Zimbleman did not provide complete answers, he did so based on instructions from Inland's counsel, rather than inadequacy of his knowledge.

In elaborating their concern about the adequacy of Zimbleman's preparation, plaintiffs cite a series of questions and answers regarding Householder's supplemental letter to Green dated June 20, 1995. Although Zimbleman was instructed by Inland's counsel to answer in his individual capacity, Zimbleman offered some context for the assertion that "Mr. Doney and Ron Zimbleman ... recall a couple of similar conversations [with Stone employees]...." June Letter, at Inland 030058. Specifically, Zimbleman responded that he could not remember any similar conversations with Stone in June 1993, but that "there were times ... where I was involved in providing [spot] tonnage to them...." Zimbleman Dep. at 252:5–7. On the basis of the record presented, the Court concludes that Zimbleman's education was far more thorough than the "woefully inadequate" preparation described in *Vitamins II*, *Vitamins III*, and *Jafari*.

Another key distinction between the evidence presented in this case and both *Vitamins II* and *Vitamins III* is that plaintiffs in this case have had available to them extensive non-privileged sources of the same information they seek from Householder. As explained in *In re Vitamins Antitrust Litig.*, 211 F.R.D. 1 (D.D.C.2002) (*"Vitamins I"*), the plaintiffs in that litigation were severely limited with respect to avenues of discovery—many documents had been destroyed and many of the individuals with knowledge of the conspiracy refused to testify, asserting their Fifth Amendment rights. *Id.* at 5. Those are, quite simply, not the facts of this

---

plained that, if the defendants were claiming attorney-client privilege (which they had failed to do before the Special Master), the defendants "would have a difficult time overcoming what appears to be a broad subject matter waiver with respect to [their] submissions to [various governmental agencies]." *Vitamins II*, 217 F.R.D. 229, 234 (D.D.C.2002). With respect to the work product doctrine, Judge Hogan only referenced the portion of the Special Master's report in

which the Special Master explained that the defendants had relied exclusively on the work product protection in opposing the motion to compel. *Id.* He did not, however, provide any comment on the merits of the work product arguments.

9. Zimbleman did not testify that he spoke with Householder as part of his deposition preparation.

case. To the contrary, Inland has produced thousands of pages of documents relating to its decision to take downtime in 1993. Additionally, numerous Inland employees have testified before the FTC, at depositions in the class action, and at depositions in the direct actions.

Finally, plaintiffs' justification for obtaining the information distinguishes this case from the arguments presented to Judge Hogan. For example, in *Vitamins III*, the Special Master's report described Bioproducts' failure to educate its Rule 30(b)(6) witness to be "material to plaintiffs' discovery in this case." *Vitamins III*, 216 F.R.D. at 173. This Court is not persuaded that the information plaintiffs seek is as crucial. Plaintiffs do not assert that vast amounts of relevant and key information is unavailable from other sources. Rather, they argue that, because several witnesses no longer remember some facts, Householder's knowledge is required to fill in gaps in their testimony. In addition, plaintiffs have explained that this information is needed to determine whether responses by Inland's employees to questions from Householder vary from the witnesses' deposition testimony.[10] Based on these stated purposes, the Court considers plaintiffs' justification to be insufficient to place their needs on par with those of the plaintiffs in *Vitamins II* and *Vitamins III*. In sum, the Court concludes that requiring a Rule 30(b)(6) witness to educate himself by learning facts known by counsel is an extraordinary remedy not required under the circumstances of this case.

### 3. *Using the Rule 30(b)(6) Deposition to Filter Opinion Work Product*

■ Recognizing the unusual nature of Judge Hogan's rulings in *Vitamins II* and *Vitamins III*, plaintiffs, in the alternative, argue that their request is akin to a Rule 30(b)(6) testimony regularly permitted by courts—designating a witness to testify as to the facts that support allegations in an an-

swer to a complaint. At oral argument, counsel for plaintiffs explained: "All we're doing here is asking for a witness to testify about the facts that support certain statements in a document that was submitted to an adversary." Transcript at 6:21–23. In addition, plaintiffs contend that the Rule 30(b)(6) deposition can serve as an effective mechanism to filter any attorney mental impressions from the information they seek. Inland responds that plaintiffs are proposing, by means of Inland's Rule 30(b)(6) deposition, to do what is otherwise improper—deposing opposing counsel about his representation of Inland. Inland argues that if its Rule 30(b)(6) designee must be educated with all facts within Householder's knowledge, the Rule 30(b)(6) deposition will become the functional equivalent of a deposition of Householder covering information learned through his service as in-house counsel at Inland. The Court agrees with Inland's position.

In support of their argument, plaintiffs cite *Protective Nat'l Ins. Co. of Omaha v. Commonwealth Ins. Co.*, 137 F.R.D. 267 (D.Neb. 1989), in which the court rejected Commonwealth's assertion that a request for the factual basis of its allegations in its answer and counterclaims infringed on attorney-client privilege and the work product doctrine. The *Protective* court explained that "[t]here is simply nothing wrong with asking for facts from a deponent even though those facts may have been communicated to the deponent by the deponent's counsel." *Id.* at 280. Plaintiffs' reliance on *Protective*, however, is unavailing. In requiring Commonwealth's corporate designee to testify as to the factual basis of its allegations, the *Protective* court did not require Commonwealth's Rule 30(b)(6) witness to educate herself with facts remembered by counsel. Instead, the *Protective* court concluded that counsel's accumulation of facts did not preclude Commonwealth's Rule 30(b)(6) witness from testifying as to those same facts.[11]

**10.** As explained in Part II.B.4, *infra*, under Third Circuit law, "the possibility of discovering information which may be useful in impeaching witnesses is not a sufficient reason to permit discovery" of protected materials. *N.L.R.B. v. Building and Const. Trades Council of Philadelphia*, 1989 WL 98643, at +3 (3d Cir. Apr.6, 1989) (citing *In re Grand Jury Investigation*, 599 F.2d 1224, 1232–33 (3d Cir.1979)).

**11.** Inland does not dispute plaintiffs' right to question Zimbleman about the facts relating to

The Court considers the ruling in *S.E.C. v. Buntrock*, 2004 WL 1470278 (N.D.Ill. June 29, 2004), to be instructive this case. In *Buntrock*, the SEC filed suit against Buntrock and other former officers of Waste Management, Inc. ("Waste Management"), following an investigation of the company. Buntrock served the SEC with a Rule 30(b)(6) notice of deposition, requiring the SEC to produce an individual prepared to testify about "the results of the SEC's investigation of Waste Management...." *Id.* at *1. The court granted the SEC's motion to quash and explained that Buntrock sought the "practical equivalent" of deposing opposing counsel because it had been SEC attorneys who had conducted the investigation of Waste Management. *Id.* at *2. This Court reaches the same conclusion as the *Buntrock* court because plaintiffs' request for a Rule 30(b)(6) witness requires the conveying of Householder's recollection and, therefore, is the functional equivalent of deposing him. See also *Am. Nat'l Red Cross v. Travelers Indem. Co. of Rhode Island*, 896 F.Supp. 8, 13–14 (D.D.C.1995) (concluding Rule 30(b)(6) witness's refusal to testify as to factual bases for affirmative defenses was justified where parties had exchanged over 200,000 pages of documents, deposed dozens of witnesses, and exchanged hundreds of exhibits).

In granting the motion to quash, the *Buntrock* court relied on the three-factor test established in *Shelton v. American Motors Corp.*, 805 F.2d 1323 (8th Cir.1986), regarding the depositions of opposing counsel. Under the test announced in *Shelton*, depositions of opposing counsel are permissible only if: "(1) no other means exist to obtain the information ...; (2) the information sought is relevant and non-privileged; and (3) the information sought is crucial to the preparation of the case." *Id.* at 1327 (citation omitted). As other courts have explained, "[a] deposition of opposing counsel is not encouraged and is typically permitted only where a clear need is shown." *Pyne v. Procacci Bros. Sales Corp.*, 1997 WL 634370, at *2 (E.D.Pa. Oct.8, 1997) (citing *Shelton*, 805 F.2d at 1327). "Absent an attorney's advice being made an issue in the case,

Inland's decision to take downtime in 1993, the

courts should exercise great care before permitting the deposition of an attorney." *Kelling v. Bridgestone/Firestone, Inc.* 153 F.R.D. 170, 171 (D.Kan.1994) (citing *N.F.A. Corp. v. Riverview Narrow Fabrics, Inc.*, 117 F.R.D. 83, 85 (M.D.N.C.1987)).

The Court concludes that plaintiffs have failed to make a showing sufficient to satisfy the *Shelton* factors. Plaintiffs contend that Householder has knowledge of information no longer recalled by Inland's other witnesses, but they have failed to demonstrate that this information is either substantial or crucial. Plaintiffs' plan to fill in gaps and impeach Inland witnesses based on contradictory statements is insufficient justification, and they fall well short of demonstrating a clear need. However plaintiffs describe their request—be it similar to what Judge Hogan ordered in *Vitamins II* or *Vitamins III* or, more simply, an inquiry into the facts underlying the assertions made in the White paper—plaintiffs want to know what Householder learned during his internal investigation. Such a Rule 30(b)(6) request is the functional equivalent of deposing Householder, and the Court will not allow plaintiffs to do indirectly by means of a Rule 30(b)(6) deposition what they cannot do directly.

### 4. *Fact or Opinion Work Product*

■ Plaintiffs' next argument is that the information requested is, at best, fact work product and can be discovered by a showing of substantial need and undue hardship. *See* Fed.R.Civ.P. 26(b)(3). Inland has represented to the Court that it does not possess any notes or memoranda created by Householder as part of his internal investigation. Plaintiffs accept this statement and are not requesting Inland to produce any documents or requesting that its Rule 30(b)(6) witness testify about the content of any documents created by Householder. Plaintiffs, instead, request information based on Householder's recollection of his conversations with Inland employees during the internal investigation. Inland has characterized such information as "core" or "opinion" work product because it constitutes Householder's mental impres-

issue analyzed in the White paper.

sions.[12] The Court agrees and concludes that the information requested by plaintiffs, even to the extent it contains factual content, is so intertwined with Householder's mental impressions that it constitutes opinion work product.

There is considerable authority in support of the proposition that an attorney's recollection of witness interviews constitutes opinion work product. *United States v. Urban Health Network, Inc.*, 1993 WL 12811, at *3 (E.D.Pa. Jan.19, 1993) ("There can be no doubt that notes prepared by an attorney or his agent of oral interviews with witnesses are core work product ...."); *see also Bloch v. Smithkline Beckman Corp.*, 1987 WL 9279, at *2 (E.D.Pa. Apr.9, 1987) (concluding that memorandum based on recollection of oral interview constituted opinion work product). For example, in *In re Appeal of Hughes*, 633 F.2d 282 (3d Cir.1980), the Third Circuit concluded that the government could not compel a private investigator (one serving as the agent of the attorney) to testify about the results of the interviews he conducted. *Id.* at 290. The *Hughes* court explained "[t]hough Hughes would presumably have been speaking from memory, examination into his recollection of the interview might have indirectly revealed his, and [the attorney's], mental processes." *Id.*

In concluding that the requested information is core work product, the Court is also guided by Judge Hogan's analysis in *Vitamins I*. In that opinion, Judge Hogan explained that, absent an "extraordinary justification," work product is not subject to discovery if "the attorney's mental impressions are [ ] thoroughly intertwined with factual information...." *Vitamins I*, 211 F.R.D. at 5. It is hard to conceive of a circumstance in which an attorney's mental impressions would be more "thoroughly intertwined" with facts than in counsel's recollection of an internal investigation. In addition, Householder, during the course of

the investigation, selected witnesses to be interviewed and decided what questions to ask them based on the FTC's inquiry. Those selections constitute core work product. See *Coleman v. General Elec. Co.*, 1995 WL 358089, at *2 (E.D.Pa. June 8, 1995) ("facts which counsel considers significant, or any specific questions about the investigation ... all fall under the category of questions about mental impressions"). Based on this conclusion, Householder's recollection is not discoverable absent an extraordinary justification. See *In re Cendant*, 343 F.3d at 663 (opinion work product is "generally afforded near absolute protection from discovery") (internal quotations omitted). Plaintiffs have not made such a showing.

The Third Circuit's opinion in *In re Grand Jury Investigation*, 599 F.2d 1224 (3d Cir. 1979), is particularly instructive in determining whether plaintiffs' justification for seeking the information is sufficient. In that case, the government issued subpoenas for all interview memoranda and questionnaires relating to an internal investigation conducted by the law of firm of Pepper, Hamilton & Scheetz on behalf of Sun Company, Inc. ("Sun"). Sun argued that those documents were protected by attorney-client privilege and the work product doctrine and were, therefore, not discoverable. In addressing the work product objections, the Third Circuit explained that "[m]emoranda summarizing oral interviews present several unique and well-documented problems to the court which considers their discoverability." *Id.* at 1231. Those problems were outlined as follows:

(1) discovery of such information may reveal the attorney's mental processes;

(2) the "reliability" of the information is subject to many factors, including interview conditions, delays in the recording of the interview,[13] and the attorney's "editorial discretion;"

---

12. Inland has also argued that these communications are protected by the attorney-client privilege.

13. It should be noted that in *In re Grand Jury Investigation*, 599 F.2d 1224 (3d Cir.1979), the lawyers "reduced their notes and recollections

concerning the interviews to memoranda ... within ten *days* of the actual interview." *Id.* at 1227 (emphasis added). In this case, the internal investigation occurred nearly *twelve years* ago.

(3) "discovery and use of such material creates the danger of converting the attorney from advocate to witness;" and

(4) the information from such recollection is of "limited utility," especially where the witness is available.

*Id.* The Third Circuit noted that this list of "problems" was not exhaustive. *Id.*

In light of these concerns, the Third Circuit next discussed whether the government had shown good cause to discover the documents at issue. With respect to the interview memoranda pertaining to an employee who was then deceased, that court ruled in favor of the government, explaining that "although the memoranda might contain inaccuracies, that possibility must be weighed against the stark inability of the government to secure the information from any more reliable source." *Id.* at 1232. Regarding the interview memoranda covering the other witnesses, that court rejected all of the government's arguments. Of particular significance to this case, the Third Circuit explained that the availability of witnesses undermined the necessity for the government to "invade an attorney's files." *Id.* Also, the Third Circuit explained that it did not believe that "the desire to impeach or corroborate a witness's testimony, by itself, would ever overcome the protection afforded the interview memoranda." [14] *Id.* at 1233.

This Court concludes that the *Grand Jury Investigation* decision completely undermines plaintiffs' asserted justification for disclosure of Householder's recollection. First, Inland's witnesses have been made available and have been deposed by plaintiffs. Thus, there is no issue that plaintiffs lack an alternative source of this information. [15] Second, the Third Circuit explicitly stated in *Grand Jury Investigation* that the use of the requested information for the purposes of impeachment or cross-examination was, by itself, insufficient to justify disclosure. Third, the accuracy of Householder's recollection is a point of significant concern for this Court. On this issue, the Third Circuit, in *Grand Jury Investigation*, noted concern with respect to the accuracy of interview memoranda that were drafted almost contemporaneously with the interviews. In this case, plaintiffs seek Householder's recollection of an investigation that took place in late 1994 and early 1995. Fourth, as explained above, the disclosure of Householder's recollection through Inland's Rule 30(b)(6) deposition would serve as the functional equivalent of converting Householder into a witness. Finally, although not specifically addressed in *Grand Jury Investigation*, this Court concludes that the use of Householder's recollection to fill in gaps in witness testimony is also insufficient. See *Urban Health Network, Inc.*, 1993 WL 12811, at *3 (rejecting "assertions of possibly faded memories" as justification to overcome work product doctrine).

### 5. Selective and Partial Waiver of Work Product Doctrine

■ Plaintiffs' final argument is that, if any of the information they seek was at one time protected by the work product doctrine, [16] that protection was waived by Inland's disclosure of the White paper to the FTC. It is Inland's contention that it has complied with its production responsibilities under the doctrine of waiver. That is to say, Inland asserts that plaintiffs are entitled to everything provided to the FTC, but nothing more. For the reasons that follow, the Court rejects plaintiffs' waiver argument as overly broad.

In the Third Circuit, *Westinghouse Elec. Corp. v. Republic of the Philippines*, 951 F.2d 1414 (3d Cir.1991), is the leading case

**14.** On this point, the Third Circuit distinguished between the interview memoranda and questionnaires, because the questionnaires had been filled out and signed by the employees themselves. *Grand Jury Investigation*, 599 F.2d at 1232.

**15.** Plaintiffs contend that these alternative sources have incomplete information. In light of *Grand Jury Investigation*, the Court considers this

argument unavailing. In that case, the Third Circuit ordered the production of counsel's interview memoranda only where, because of the death of a witness, there was no alternative means of obtaining any of the information.

**16.** Plaintiffs also argued that the attorney-client privilege was waived. Because the Court does not rely on the attorney-client privilege in deciding the motion, it will not address that issue.

on waiver of work product protection. At issue in *Westinghouse* was the question of whether the doctrine of "selective waiver" applied to documents voluntarily submitted to government agencies. In *Westinghouse,* the Third Circuit explained that selective waiver "permits the client who has disclosed privileged communications to one party to continue asserting the privilege against other parties." *Id.* at 1423 n. 7. That court rejected selective waiver and held that a corporation's disclosure of documents to government agencies waived any work product protection that pertained to those documents. *Id.* at 1429. The question of selective waiver is not at issue in this case because Inland has disclosed to plaintiffs all documents produced to the FTC.

The parties dispute whether *Westinghouse* controls this Court's analysis on the issue of partial waiver. Partial waiver, as explained in *Westinghouse,* "... permits a client who has disclosed a portion of privileged communications to continue asserting the privilege as to the remaining portions of the same communications." *Id.* at 1423 n. 7. Inland argues that, under *Westinghouse,* it is not required to disclose anything other than what it produced for the FTC. In support of this view of *Westinghouse,* Inland cites *In re Hechinger Inv. Co. of Delaware,* 303 B.R. 18 (D.Del.2003) in which the bankruptcy court explained:

> The Third Circuit's precise holding in *Westinghouse* was that, when "a party discloses a portion of otherwise privileged materials while withholding the rest, the privilege is waived only as to those communications actually disclosed," unless this "partial waiver would be unfair to the party's adversary."

*Id.* at 24 (quoting *Westinghouse,* 951 F.2d at 1426 n. 13).

Plaintiffs disagree and assert that *Westinghouse* does not foreclose discovery of documents or other protected information in addition to what was disclosed to the government agencies. Plaintiffs, instead, argue that "disclosure of work-product to an adversary waives work product protection for the subject matter of the disclosure, including both the submission *and* the underlying materials." Pl. Letter/Brief, Aug. 21, 2006 at 3 (emphasis in original). In arguing that any protections pertaining to Householder's recollection of the internal investigation have been waived, plaintiffs rely heavily on the Fourth Circuit decision in *In re Martin Marietta Corp.,* 856 F.2d 619 (4th Cir.1988).

The question of partial waiver was not at issue in *Westinghouse,* but the language in footnote 12 offers guidance on this issue. *Westinghouse,* 951 F.2d at 1426 n. 12. In discussing the question of fairness in relation to partial disclosures, the *Westinghouse* court cited *In re von Bulow,* 828 F.2d 94 (2d Cir.1987), a partial waiver case involving the disclosure of confidential communications in a published book. In *von Bulow,* the Second Circuit explained that the fairness doctrine "aim[s] to prevent prejudice to a party and distortion of the judicial process that may be caused by the privilege-holder's selective disclosure during litigation of otherwise privileged information." *Id.* at 101. The rationale of this rule is that, if limited disclosure of privileged information leads to prejudice, fairness dictates complete disclosure. *Katz v. AT & T Corp.,* 191 F.R.D. 433, 439 (E.D.Pa.2000).

In this Court's opinion, fairness does not dictate the disclosure of Householder's recollection. Plaintiffs assert, and the Court agrees, that they are entitled to cross-examine Inland about the assertions set forth in the White paper. But the Court disagrees with plaintiffs' position that they have been precluded from doing so. Zimbleman was educated with facts relating to Inland's decision to take downtime and Inland has produced for deposition numerous current and former employees, including the five individuals mentioned in the relevant portions of the White paper and other decision-makers. See *In re Woolworth Corp. Sec. Class Action,* 1996 WL 306576, at *3 (S.D.N.Y. June 7, 1996) (concluding that availability of witnesses to testify about facts disclosed in report undermined argument that fairness dictated disclosure of notes and interview memoranda prepared during internal investigation).

Other courts have also held that disclosure of a report—something equivalent to the

White paper—does not require disclosure of documents memorializing the underlying facts. For example, in *Boling v. First Util. Dist. of Knox County*, 1998 WL 917522, 1998 U.S. Dist. LEXIS 21123 (E.D.Tenn. Oct. 28, 1998), the court held that the production to the EEOC of a report generated from an investigation into the plaintiff's complaint of sexual harassment did not waive the work product doctrine with respect to the notes of interviews taken during the investigation. *Id.* at *1, 1998 U.S. Dist. LEXIS 21123 at *5. The report provided by the District in *Boling* contained "representations by the [defendant] District of what its understanding of the facts were, based on the investigation, its response to allegations, its conclusion and certain information requested by the EEOC." *Id.* at *2–3, 1998 U.S. Dist. LEXIS 21123 at *7. The *Boling* court noted that a key factor in its decision was the fact that the District was not "asserting in this litigation that the investigation . . . and the actions taken pursuant thereto constitute a defense to liability." *Id.* at *2, 1998 U.S. Dist. LEXIS 21123 at *6. *Compare In re Kidder Peabody Sec. Litig.*, 168 F.R.D. 459, 471–72 (S.D.N.Y. 1996) (*"Kidder"*) (requiring disclosure of underlying materials because party "repeatedly invoked . . . the report as an independent and reliable account of the facts and . . . its assessment of responsibility").

The facts of this case are quite similar to those presented in *Boling*. In this case, the White paper contains representations by Inland of its understanding of the facts, based on its internal investigation, in response to a request for information by the FTC. Inland has not put the White paper "at issue" in this litigation; Inland does not assert that its internal investigation forecloses antitrust liability. In *Kidder*, the report was referenced repeatedly as part of a "continuing effort to influence the outcome of pending or anticipated litigations and agency investigations." *Kidder*, 168 F.R.D. at 471. Inland's use of the White paper does not compare to the way in which the report in *Kidder* was utilized.

The Court also rejects plaintiffs' formulation of the waiver rule and its application to the facts of this case. In *Martin Marietta*, the Fourth Circuit explained that waiver ex-

tends to the information disclosed as well as "the details underlying the data which was . . . published." *Martin Marietta*, 856 F.2d at 623 (quoting *United States v. (Under Seal)*, 748 F.2d 871, 875 (4th Cir.1984)). Plaintiffs' reliance on *Martin Marietta*, however, is unavailing. First, in concluding that Martin Marietta had waived the work product doctrine as to the specific materials quoted in its submissions to the government and all materials "on the same subject matter as that disclosed," the Fourth Circuit stated that "subject matter waiver . . . should not extend to opinion work product." *Martin Marietta*, 856 F.2d at 625–26; *see also Informatica Corp. v. Business Objects Data Integration, Inc.*, 454 F.Supp.2d 957, 963, 2006 WL 2038461, at *6 (N.D.Cal.2006) (citing *In re EchoStar Communications Corp.*, 448 F.3d 1294, 1302 (Fed.Cir. May 1, 2006) ("work-product waiver only extends to 'factual' or 'non-opinion' work product")). As explained above, Householder's recollection constitutes opinion work product or commingled fact and opinion work product and, therefore, any work product protection waived by the disclosure of the White paper cannot extend to the information plaintiffs seek.

Second, the language relied upon by plaintiffs—that they are entitled to the "details underlying the data . . ." *Martin Marietta*, 856 F.2d at 623—is overly broad. As explained by another district court, if the rule were that broad, the rule "would render it virtually impossible for a corporate client to have a candid and full discussion with its counsel as to what should be disclosed . . . since any disclosure would waive privilege as to those discussions." *Calvin Klein Trademark Trust v. Wachner*, 124 F.Supp.2d 207, 210 (S.D.N.Y.2000). In *Calvin Klein*, Judge Rakoff explained that such broad waiver applies only to "situations in which the party making the disclosure [is] seeking to use it affirmatively in the controversy without permitting its adversary to inquire about the basis or accuracy of the disclosure." *Id.* The Court agrees with this formulation and concludes that Inland's actions do not mandate such a broad waiver of protections in this case. Inland has not precluded plaintiffs from inquiring about the basis or accuracy of

the facts disclosed in the White paper. To the contrary, it has provided plaintiffs' with all of the documents specifically referenced in the White paper, offered corporate testimony on the events described in the White paper, and produced employees with first-hand knowledge of those events. Therefore, the Court rejects plaintiffs' waiver argument.

## III. CONCLUSION

For all of the aforementioned reasons, plaintiffs' motion to compel Inland to provide a Rule 30(b)(6) witness educated with facts recalled by Inland's in-house counsel Steven L. Householder, Esq. about an investigation he conducted is denied. The Court disagrees with plaintiffs' contention that Inland's Rule 30(b)(6) witness was not "properly educated" because the witness did not obtain facts known by Householder on the ground that this requirement is exceptional and need only be imposed if, unlike this case, the information sought is unavailable through other means. Second, the Court disagrees with plaintiffs' general characterization of their request as being one for the facts underlying assertions made in the White paper. Plaintiffs, instead, have essentially asked to depose Householder about what he learned as in-house counsel during an internal investigation through the guise of a Rule 30(b)(6) deposition. Third, the Court concludes that Householder's recollection constitutes opinion work product or commingled fact and opinion work product and is not discoverable, absent an extraordinary showing, which plaintiffs have not demonstrated. Finally, plaintiffs have failed to establish that any work product protection relating to Householder's recollection of the internal investigation has been waived by the disclosure of the White paper to the FTC. In sum, the Court will not allow plaintiffs to make such an end-run around the work product doctrine under the circumstances presented.[17]

While the Court's ruling narrows the scope of the additional testimony Inland's Rule 30(b)(6) witness must provide, further discovery relating to the White paper is permitted. Specifically, by agreement, Inland is required to produce a Rule 30(b)(6) witness to testify as to whether statements in the White paper constitute Inland's position. Moreover, to the extent that any of the objections made by counsel for Inland at Zimbleman's Rule 30(b)(6) deposition are inconsistent with what is set forth in this Memorandum, plaintiffs' counsel is not precluded from inquiring further on these issues at the Rule 30(b)(6) deposition. In addition, the Court's ruling does not foreclose plaintiffs from utilizing appropriate contention interrogatories to elicit specific facts in support of selected statements in the White paper.

An appropriate Order follows.

## ORDER

**AND NOW**, this 5th day of September, 2006, upon consideration of plaintiffs' letter/motion to compel Temple–Inland, Inc. ("Inland") to produce a Rule 30(b)(6) witness to testify on disputed topics (Doc. No. 808, filed April 7, 2006) and the related submissions of the parties,[1] for the reasons stated in the attached Memorandum, **IT IS ORDERED** that plaintiffs' letter/motion to compel Inland to produce a Rule 30(b)(6) witness to testify on disputed topics is **GRANTED IN PART** and **DENIED IN PART** as follows:

(1) That part of the motion in which plaintiffs seek to compel Inland to produce a Rule 30(b)(6) witness to testify concerning the recollection of Inland's in-house counsel about an internal investigation conducted in 1994 and 1995 is **DENIED;**

(2) That part of the motion in which plaintiffs seek to compel Inland to produce a Rule 30(b)(6) witness to testify con-

---

17. The Court's ruling renders moot plaintiffs' request for a Rule 30(b)(6) witness educated about the documents Inland created as part of the internal investigation and what happened to those documents.

1. The parties have submitted a total of five letter/briefs, only the first of which was docketed.

All of those letter/briefs and the attached exhibits constitute the record on the discovery issues addressed in the attached Memorandum; the submissions not yet filed shall be docketed by the Deputy Clerk with the filing of this Memorandum and Order.

cerning the documents Inland created as part of its internal investigation in response to the Federal Trade Commission's ("FTC") inquiry is **DENIED;**

(3) By agreement, that part of the motion in which plaintiffs seek to compel Inland to produce a Rule 30(b)(6) witness as to Inland's position on specific statements in the White paper is **GRANTED;** and

(4) By agreement, that part of the motion in which plaintiffs seek to compel Inland to produce a Rule 30(b)(6) witness to testify concerning verbal communications with the FTC is **GRANTED.**

**IT IS FURTHER ORDERED** that, to the extent that any of the objections made by counsel for Inland at the Rule 30(b)(6) deposition of Ronald Zimbleman are inconsistent with what is set forth in the attached Memorandum, plaintiffs' counsel is not precluded from inquiring further on these issues at the second Rule 30(b)(6) deposition.[2]

---

**2.** The Court was not asked in the letter/briefs to address these objections interposed by Inland's counsel.